In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3299

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER JOHNS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-cr-39—**Rudolph T. Randa**, *Judge.*

ARGUED APRIL 19, 2012—DECIDED JULY 17, 2012

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2005, the housing market in
America was near its peak. Allen Banks wanted to cash
in on the housing bubble, and Christopher Johns—the
defendant in this case—was willing to help. Banks was a
construction worker by trade, and he was hoping to
purchase houses from distressed homeowners and flip
those houses for a profit. The problem, it seems, was that

he did not have enough capital to conduct this business. Johns knew a scheme to work around this problem, and taught that scheme to Banks. Together, Johns and Banks would purchase homes from distressed owners at inflated prices, perhaps nearing the highest price that they might sell for if the homes were not approaching a forced sale. As a condition of the purchase, however, the homeowners had to promise that they would return the amount of money they received above and beyond what they owed their own lenders. In essence, Johns and Banks were manufacturing equity, then demanding it back from the homeowners. The owners were willing to go along, since their only other option was foreclosure and a forced sale. Banks' benefit was that he could renovate the newly-acquired houses simply by using the funding he received for the purchase of the home, then pay back his lender after the home was resold. Johns, meanwhile, would collect a broker's fee for each sale.

Eventually Johns and Banks conducted this scheme to purchase a home from a couple in bankruptcy. For whatever reason, Johns and Banks decided that a mortgage was necessary to secure the return payment (what Johns called the "rinsed equity") from the owners of the home to Banks at closing. Johns wrote up a mortgage document listing Banks' girlfriend as the mortgagee, and he told the trustee of the owners' bankruptcy estate about the second, seemingly fraudulent mortgage. Despite some protestations by the trustee, the sale went through, and Banks used some of the rinsed equity to pay off all of the owners' creditors through the bankruptcy

trustee. The owners' bankruptcy lawyer, however, became suspicious, and eventually caught on to Johns and Banks' scheme, which eventually led to the indictment of Johns and Banks. This appeal is from Johns' conviction for making false representations to the debtors' trustee regarding the second mortgage and for receiving property from a debtor with the intent to defeat the provisions of the Bankruptcy Code. Johns challenges the sufficiency of the evidence for all four counts against him and the jury instructions. Johns also challenges two sentencing enhancements the court included in its calculation of Johns' guidelines range—one for the financial loss caused by Johns and one for targeting vulnerable victims—before the court sentenced Johns to 30 months in prison. For the following reasons, we affirm in part and reverse in part the district court's rulings, and remand for further proceedings.

## I. Background

Johns and Banks first connected at Prosperity Mortgage, a company owned by Johns, where Banks worked for Johns repairing customers' credit. The genesis of the scheme was Banks' desire to get involved in the real estate business, which, at the time, was very lucrative due to the housing bubble. Banks had a background in construction, and it was his desire to purchase houses, rehabilitate them, and sell them at a profit. The problem, as mentioned above, was that Banks did not have the capital to purchase and rehabilitate these houses.

Johns had a solution this problem. While the record is unclear as to when and how the two decided to begin the scheme at issue, at some point Johns taught Banks how to "rinse equity." The first step of the scheme was to locate a house on the verge of foreclosure and offer to purchase the house. Instead of offering the reduced price for which a foreclosure house would usually sell, however, Banks would offer an inflated price. This would allow the sellers to pay off their mortgage, avoid the foreclosure process, and have "equity" left-over. The catch was that Banks would require the sellers to return the newly-created equity to him once the sale went through. The sellers would therefore avoid the negative effects of having gone through a foreclosure and would walk away from the deal with their mortgage paid off, but would not leave with any additional monetary benefit. To fund his purchase of these homes, Banks sought financing from a lender, who was unaware of the fact that, in reality, Banks was purchasing homes for less than the amount that he was actually borrowing. In essence, Banks' lender provided loans to purchase homes, but Banks used that money to both purchase *and* renovate those homes. The benefit to Johns in this scheme was the fee he would receive for acting as broker for the deal. The sellers would not deal directly with Banks until the actual closing; rather, Johns would conduct all negotiations and arrange the purchase. In exchange, he collected a seemingly standard broker's fee.

Johns and Banks first conducted this scheme with Johns' house. Banks purchased the house and, upon closing,

received close to $20,000 back from Johns. The check, however, was not made out to Banks, but to a third party, presumably to avoid any suspicions from lenders involved in the purchase.

While there are several relevant sales in this case, the actual charges levied against Johns—charges of false statements in a bankruptcy proceeding and receipt of property in a manner inconsistent with the purposes of the bankruptcy process—stemmed from the purchase of Arthur and Bobbie Ten Hoves' home. At the time that the Ten Hoves were approached by Banks and Johns, they were involved in Chapter 13 bankruptcy proceedings. They were also approaching a sheriff's sale of their home, since they were unable to make their mortgage payments to their lender. The Ten Hoves were introduced to Johns as a "mortgage guy" that would purchase their home and help them avoid the ruinous effects that foreclosure would have on their credit. Johns first attempted to purchase the property by way of short sale, offering $62,000 for the home despite the $87,000 that the Ten Hoves' still owed their lender. The Ten Hoves agreed to the sale, but the lender rejected it. Six weeks later Johns again approached the Ten Hoves, this time acting as Banks' agent. Johns, on behalf of Banks, offered the Ten Hoves $120,000 for their home, but asked that the Ten Hoves promise to pay back $30,000 to Banks at closing, which was all but $3,000 of the "equity" in the Ten Hoves' home. The Ten Hoves agreed to the deal.

In order to secure the Ten Hoves' promise to pay Banks $30,000 at closing, Johns had them sign a mortgage

document. The document allegedly secured the $30,000 payment owed to Banks, but the mortgagee listed was Stephanie Fledderman, Banks' girlfriend. Both the Ten Hoves and Fledderman testified that they had never met, and Fledderman confirmed that she never loaned the Ten Hoves any money. While the mortgage document states that it stands as security for a $30,000 note, the parties never actually executed a note. The Ten Hoves testified that they did not know they were singing a mortgage document, and that they thought they were signing something having to do with their bankruptcy proceedings.

Since the Ten Hoves were in bankruptcy at this time, Johns and Banks needed more than the Ten Hoves' consent in order to execute the deal. When individuals are in bankruptcy, any sale of their assets must be approved by the trustee or the Bankruptcy Court, so as to ensure the fair and equitable distribution of assets among all creditors. Accordingly, Johns contacted the Ten Hoves' trustee, asking how much the Ten Hoves owed all of their creditors and whether the trustee would approve the sale of the Ten Hoves' house to Banks. Johns also faxed the trustee numerous documents regarding the sale, including the mortgage document signed by the Ten Hoves. The trustee's office informed Johns that the Ten Hoves had $13,709.37 of debt, but denied him permission to execute the sale of the Ten Hoves' home based on the fact that the $30,000 unrecorded mortgage was not included in the Ten Hoves' bankruptcy petition and payment schedule. Johns nonetheless went through with the sale. Johns, Banks, and the Ten Hoves

closed sometime in April 2005. A $13,709.37 check was issued to the Ten Hoves' trustee in satisfaction of their debt in bankruptcy.[1] This money was taken out of the equity that was supposed to be rinsed to Banks, and thus the Ten Hoves were only able to make a $13,723.75 payment instead of the full $30,000. That payment was made to Fledderman—though she was not present at the closing—and despite the fact that it was less than half the amount promised in the mortgage document, it was considered as satisfying the mortgage. Fledderman promptly forwarded the equity payment to Banks. As always, Johns received his standard broker's fee. The Ten Hoves were able to avoid foreclosure and walked away from the deal without any debt, but they did not capture any equity that might have existed in their home. Up until closing, Arthur Ten Hove believed that he might be able to keep some of the equity. He testified that Johns told him originally that he could keep $9,000, but that number was reduced as closing drew near, and at closing it was revealed that he would not be able to keep any of the equity.

The unpermitted sale had the obvious effect of raising some red flags with the trustee. Before the sale even took place, a staff attorney at the trustee's office notified the Ten Hoves' bankruptcy attorney, Michael Watton, of

---

[1] The $13,709.37 paid to the trustee represented the full amount of the Ten Hoves' debt. If they would have proceeded with their bankruptcy payments, the Ten Hoves would not have had to pay this amount, but rather would have paid only a percentage of the debt they owed, in accordance with the bankruptcy settlement that was reached in their Chapter 13 proceedings.

the unrecorded second mortgage and the proposed sale that was rejected. This prompted Watton to conduct an investigation into the matter. In analyzing the mortgage document signed by the Ten Hoves, Watton noticed several irregularities, including a problem with the notary stamp, an incorrect date, and the fact that the document was allegedly drafted by Fledderman, someone that Watton was not familiar with. After speaking with the Ten Hoves about the sale, Watton and the Ten Hoves decided to sue all those involved except Banks, since they were unaware that Fledderman gave Banks the money that she received as a result of the sale. Watton's investigation also lead to the indictment of Banks and Johns.

On March 16, 2010, Johns was indicted by a grand jury for four counts of bankruptcy fraud. Under the first three counts, Johns was alleged to have made a false statement to the bankruptcy trustee when he affirmed that the Ten Hoves' home was encumbered by a second mortgage, in violation of 18 U.S.C. § 152(8) (prohibiting the making of a false entry in recorded information relating the property of a debtor), 18 U.S.C. § 157 (prohibiting the making of a false or fraudulent representation in relation to a bankruptcy proceeding), and 18 U.S.C. § 1519 (prohibiting the making of a false entry in a record with the intent to influence the administration of a bankruptcy proceeding). The fourth count alleged that Johns "knowingly and fraudulently receive[d]" property from a debtor in bankruptcy "with intent to defeat the provisions of title 11." 18 U.S.C. § 152(5).

At trial, the government put on evidence suggesting that the mortgage document signed by the Ten Hoves was

fraudulent in an attempt to prove that Johns' statement to the trustee regarding the $30,000 encumbrance on the Ten Hoves' home was false. The defense countered by arguing that despite some irregularities with the mortgage document, the Ten Hoves' home was, in fact, encumbered by a $30,000 second mortgage, and thus Johns' statement to the trustee about the existence of said mortgage was not false. The government also put on evidence that the Ten Hoves paid 100% of the money that they owed to their creditors despite the fact that they would have had to pay only 70% if they stuck to their bankruptcy plan. This, the government argued, defeated the purpose of Title 11 in violation of 18 U.S.C. § 152(5). Johns disagreed with this contention, pointing out that the Ten Hoves emerged from bankruptcy early, the Ten Hoves were debt free as a result of the deal, and all of the Ten Hoves' creditors were paid in full.

Before the case went to the jury, Johns filed a motion for acquittal, making the arguments outlined above, and the court denied the motion. Johns also requested that the jury instructions include an explanation of Wisconsin's mortgage and contract law to aid the jury in its determination of whether the Ten Hoves' home was, in fact, encumbered by a $30,000 mortgage. The judge denied this request as well, ruling that there was no evidence to support a finding that a valid mortgage existed, and thus no need to inform the jury on what constitutes a valid mortgage under Wisconsin law.

The jury convicted Johns on all four counts, and Johns renewed his motion for acquittal. He also filed a motion for a new trial. Johns argued that there was

an actual contract between Banks and the Ten Hoves that was secured by a genuine mortgage, and thus his statement to the trustee about a $30,000 encumbrance was not false. The court again denied Johns' motions, holding that the evidence unequivocally proved that there was not a valid mortgage between the Ten Hoves and Fledderman or Banks, and thus his statement regarding the second mortgage to the trustee could not have been true.

At sentencing, the district court made two findings that are relevant to this appeal. The first involves the loss amount used to determine Johns' sentencing guidelines range. All four counts in Johns' indictment stemmed from the Ten Hoves sale, but the court considered two other equity-rinsing schemes in calculating the loss amount for his guidelines range, since those sales constituted "relevant conduct" under the sentencing guidelines. First, Johns and Banks conducted a scheme that was substantially similar to the Ten Hoves sale when they purchased the home of Michelle Coleman, except for the fact that Coleman was not in bankruptcy proceedings and no mortgage document was involved. As with the Ten Hoves sale, Coleman agreed to direct her proceeds from the sale of her home to Fledderman, since Coleman was experiencing financial difficulty and had foreclosure as her only other option. Coleman did, however, object to the "rinsing" quite a bit more than the Ten Hoves. The district court considered the "rinsed" equity in both the Coleman and Ten Hoves sale to be an "intended loss" of Johns and Banks' scheme, and

thus factored the returned payments to Banks into the calculation of Johns' sentencing guidelines range.

The other equity-rinsing sale that was considered by the court involved the purchase of Lynne and Jeffrey Spellers' home. Johns was less involved in the Spellers' sale than the other two sales. The scheme actually began not with Banks and Johns, but with a man named Sean Cooper. The Spellers were having financial difficulties in 2005, and Cooper was introduced to them as someone who might be able to help with their mortgage trouble. The original plan was for Cooper to find a buyer for the home that would permit the Spellers to rent the property until they could purchase it back. Cooper found Johns, who first offered to purchase the property but then backed out of the deal. Johns instead referred Cooper to Banks, who eventually purchased the property conducting the same scheme that he used on Coleman and on the Ten Hoves. Johns did not serve as a broker to this deal, but $60,000 of the equity generated by Banks' purchase went into a bank account for "Cooper Banks and Johns Asset management Group." There was no evidence suggesting that Johns used any of the money gained from the purchase of the Spellers' home. The district court nonetheless considered the "rinsed equity" from the sale of the Spellers' home to be a loss under the sentencing guidelines, and included that loss in calculating Johns' loss amount, reasoning in part that Johns taught Banks how to conduct the scheme used to defraud the Spellers.

The district court also applied a vulnerable victim enhancement in determining Johns' guidelines range. The court reasoned that Johns' targets were vulnerable,

since they were all in financial distress, and that the blue-collar backgrounds of Coleman and the Ten Hoves made them even more susceptible to schemes of this nature. This enhancement increased Johns' guidelines range from 15-21 months to 41-52 months. The government nonetheless recommended that Johns receive a four-level reduction based on the § 3553(a) factors. The court ultimately gave Johns a below-guidelines sentence of 31 months on each count, to be served concurrently.

Johns has appealed several rulings of the district court. He first argues that the evidence was insufficient to convict him for all four counts, and thus the district court erred in denying his motion for acquittal. He also argues that the court erred in denying his proposed amendments to the jury instructions which, he argues, entitles him to a new trial. Finally, Johns argues that if his convictions stand, we should find that the district court erred in calculating the loss amount for Johns' crimes and in applying a vulnerable victim enhancement to Johns' sentencing guidelines.

## II.  Discussion

### A.  Counts One through Three

In order for Johns to have been convicted of counts one through three in his indictment, the jury needed to find that he made materially false and fraudulent representations to the Ten Hoves' Chapter 13 trustee. *See* 18 U.S.C. §§ 2, 152(8), 157(3), and 1519. Johns argues that the representation he made to the trustee—that the

Ten Hoves' home was encumbered by a $30,000 mortgage—was unquestionably true, and thus there is insufficient evidence to convict Johns on counts one through three. In the alternative, Johns argues that the jury instructions in his case were faulty. More specifically, he argues that the jury, rather than the judge, should have decided whether a valid mortgage existed between the Ten Hoves and Fledderman, and that, accordingly, the jury should have been presented with instructions informing it of Wisconsin's law on mortgages and contracts. We now turn to these arguments.

### 1. Sufficiency of the Evidence

The first district court action that Johns challenges is the denial of his motion for judgment of acquittal, in which he argued that there was not sufficient evidence to convict him on Counts one through three. While we review de novo a denial of a motion for judgment of acquittal, *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011), this standard of review is slightly deceiving. A review of a motion for acquittal is in essence the same as a review of the sufficiency of the evidence. "We evaluate the evidence in the light most favorable to the government, and if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' the judge committed no error in denying the motion for acquittal and we will affirm the conviction." *United States v. Douglas*, 874 F.2d 1145, 1155 (7th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990).

The question we must answer is whether the mortgage document established a genuine mortgage securing a $30,000 obligation; if it did not, then Johns made a materially false representation to the Chapter 13 Trustee, and his argument to the contrary fails. In support of the existence of a mortgage, Johns cites Wisconsin case law explaining that a mortgage does not need separate consideration in order to be valid, and that only the underlying obligation must involve the exchange of consideration. *See, e.g., Mitchell Bank v. Schanke*, 676 N.W.2d 849, 859-60 (Wis. 2004). Thus, the fact that Fledderman never actually loaned the Ten Hoves money or interacted with them in any way does not invalidate the mortgage that was allegedly executed by the Ten Hoves since, he argues, the mortgage document secured the enforceable underlying obligation that the Ten Hoves had to Banks. Johns further contends that the mortgage document at issue is valid under the statute of frauds, but that, in any event, the Ten Hoves' performance of the agreement they had with Banks makes that contract valid, regardless of whether the statute of frauds would have made it voidable.

The district court rejected Johns' arguments concerning the sufficiency of the evidence on Counts one through three, ruling that regardless of whether the mortgage was facially valid, the evidence clearly showed that there was no actual mortgage as a matter of law. The district court did not explain why no genuine mortgage existed in this case, but in defending the court's decision, the government argues that there was no underlying obligation between Banks and the Ten Hoves at all, at least with respect to the $30,000 of equity that was to be rinsed back

to Banks upon closing. With no underlying obligation, the government contends, there obviously could not be a mortgage securing that obligation. In support of this contention, the government points out several facts about the sale of the Ten Hoves' home. The government explains that the Ten Hoves only dealt with Johns before closing and that they were unaware of what they were signing when they executed the mortgage document. The government further argues that the mortgage document did not satisfy the statute of frauds. These points, they argue, prove that there was no obligation between the Ten Hoves and Banks, other than the deal for Banks to purchase their home for $120,000. The government does not cite any case law in reaching this conclusion.

We do not doubt that the points made in Johns' brief regarding the legal requirements for a valid mortgage are accurate. He is correct in stating that, under both Wisconsin law and contract law generally, a mortgage does not need separate consideration to be enforceable, since it is not a contract, but rather secures a contractual obligation. *See* Restatement of Property: Mortgages, § 1.2, comment. A mortgage is only enforceable, however, to the extent that the underlying obligation is enforceable,[2] *id.*; "[u]nless it secures an obligation, a mortgage is a nullity." Restatement of Property: Mortgages, § 1.1, comment (a); *see also Mitchell Bank*, 676 N.W.2d at 859 (quoting *Doyon & Rayne Lumber Co.*, 220 N.W. 181, 182 (1928)) ("Where there is no debt—no relation of debtor and creditor-there can be no mortgage."). Thus, if

---

[2] There are some exceptions to this rule, but they are irrelevant to this case.

the government's attack on the underlying $30,000 obligation that allegedly existed between Ten Hoves and Banks is successful, the mortgage would have nothing to secure, and would therefore not exist.

Several of the government's arguments against the existence of a $30,000 obligation to Banks, however, miss the mark. For instance, the fact that the Ten Hoves only dealt with Johns up until the closing, where they finally met Banks, is irrelevant; parties to a contract deal through agents all of the time. *See, e.g., United States v. Ramirez*, 574 F.3d 869, 875-76 (7th Cir. 2009). Further, the Ten Hoves' failure to read or fully understand the mortgage document, without more, does not negate the existence of an agreement. *See Raasch v. City of Milwaukee*, 750 N.W.2d 492, 498 (Wis. Ct. App. 2008) (quoting *Rent-A-Center, Inc. v. Hall*, 510 N.W.2d 789, 792 n.5 (Wis. Ct. App. 1993)) ("It is the 'firmly fixed' law in this state that, absent fraud, a person may not avoid the clear terms of a signed contract by claiming that he or she did not read or understand the contract."); *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1417 (7th Cir. 1987) ("One who signs a contract in the absence of fraud or deceit cannot avoid it on the grounds that he did not read it or that he took someone else's word as to what it contained.").[3] As for the government's statute of frauds argument, it may or may not be meritorious, but the district court found, and we agree, that the mortgage did

---

[3] It may be that there was fraud or deceit at play regarding Johns' efforts to get the Ten Hoves to sign the mortgage document, but the government does not argue that the Ten Hoves were the victims of fraud with regard to this specific document, as opposed to a general fraudulent scheme.

not exist even if it was facially acceptable, and thus we need not consider this issue.

First, assuming that there was a valid obligation for the Ten Hoves to pay Banks $30,000 at closing, there is no evidence connecting that obligation owed to Banks with the alleged mortgage security held by Fledderman. The mortgage document signed by the Ten Hoves states, in pertinent part:

> Arthur E. Ten Hove and Bobbie J. Ten Hove . . . mortgages to Stephanie Fledderman ("Mortgagee", whether one or more) to secure payment of Thirty-thousand and No/100 Dollars ($30,000) evidenced by a not [sic] or notes bearing on even date executed by Arthur E. Ten Hove and Bobbie J. Ten Hove . . . to Mortgagee, and any extension and renewals of the note or notes, and the payment of all other sums, with interest, advanced to protect the security of this Mortgage, the following property . . . .

Banks' name is conspicuously absent from that language (as well as the rest of the document). The document clearly contemplates an obligation to pay Fledderman $30,000, secured by a mortgage on the Ten Hoves' house, with absolutely no connection to Banks. Since the evidence is also clear that the Ten Hoves were oblivious to Fledderman's involvement in this transaction, a connection between the obligation to Banks and the secured obligation to Fledderman cannot be substantiated through parol evidence. Thus, the mortgage document did not secure the obligation owed to Banks by the Ten Hoves.

Johns' representation regarding a $30,000 encumbrance on the Ten Hoves' home could still have been true, however, if the mortgage document secured an obligation of $30,000 to Fledderman herself. As illustrated above, the mortgage document clearly contemplates the existence of an obligation from the Ten Hoves to Fledderman. Yet there is no evidence that Fledderman and the Ten Hoves ever met, so any underlying agreement and obligation that would serve to validate the existence of a mortgage would need to exist within the confines of the mortgage document itself, not through some outside agreement. The document does state that the Ten Hoves agree to pay Fledderman $30,000, but there are two problems that prevent this statement from establishing an actual contract between the Ten Hoves and Fledderman. First, Fledderman never signed the agreement, nor is there any evidence that she was aware of a mortgage agreement between herself and the Ten Hoves. Thus, there could not have been a meeting of the minds between the alleged parties to the contract, and no underlying contract was formed. *See Household Utilities, Inc. v. Andrews Co., Inc.*, 236 N.W.2d 663, 669 (Wis. 1976) (explaining that a contract cannot exist without a "meeting of the minds," and that "[t]here is no meeting of the minds where the parties do not intend to contract"). Even if Fledderman was party to an underlying agreement, however, the agreement would fail due to lack of consideration. Under the terms of the mortgage document, the Ten Hoves owe Fledderman $30,000, which is secured by a mortgage on the Ten Hoves' house, but Fledderman owes nothing in return. Thus, the underlying

agreement that would be secured by the alleged mortgage would lack consideration, the obligation would be unenforceable, *First Wisconsin Nat. Bank of Milwaukee v. Oby*, 188 N.W. 2d 454, 459 (Wis. 1971); *Cawley v. Kelley*, 19 N.W. 65, 66 (Wis. 1884), and the mortgage would be a "nullity," Restatement of Property: Mortgages, § 1.1, comment; s*ee also Mitchell Bank*, 676 N.W.2d at 859.

Johns has a response to this. He argues that the Fledderman mortgage is not a stand-alone mortgage/contract, but rather a part of an "overall agreement." The consideration for that agreement, he claims, is obvious: the Ten Hoves receive the ability to avoid the black mark of foreclosure, sell their home, and get out of their bankruptcy proceedings, and in exchange they must sell their home, execute a mortgage in favor of Fledderman, and pay that mortgage off at the closing of the sale of their home. This seems to be a legitimate agreement that could be enforceable, putting aside any potential problems arising from the fact that the beneficiary of the mortgage is not the obligee of the underlying obligation. The problem is that the Ten Hoves did not agree to it. Such an agreement is not codified in the mortgage document, and the evidence was more than sufficient for a jury to find that the Ten Hoves were oblivious to Johns and Banks' scheme, and that they were unaware that they were providing a mortgage to Fledderman to, in effect, secure their obligation to Banks. There was therefore no meeting of the minds, and thus no enforceable "overall agreement" approved by the Ten Hoves and secured by the mortgage document. *See Household Utilities, Inc.*, 236 N.W.2d at 669.

Johns could argue that Wisconsin courts "give effect to the parties' intent to contract if such intent is discernible from their conduct," *Herder Hallmark Consultants, Inc. v. Reginier Consulting Group, Inc.*, 685 N.W.2d 564, 566 (Wis. 2004), but given that the Ten Hoves did not even know that a second mortgage was involved in the deal, we cannot discern an intent to include such a mortgage from the Ten Hoves' sale of their house or rinsing of their equity. Johns could also argue that he was simply mistaken about Wisconsin mortgage law, and thus did not *knowingly* make a false representation to the Chapter 13 Trustee. In his brief, however, Johns states that "[c]ounts one through three of the indictment rise and fall on whether at the time Johns reported the mortgage to the bankruptcy trustee the Ten Hoves' home was encumbered by a thirty thousand dollar mortgage," apparently conceding any possible argument based on scienter. These arguments have therefore been waived for failure to present them this Court on appeal. *United States v. Powell*, 576 F.3d 482, 497 n.6 (7th Cir. 2009).

We therefore conclude that, as a matter of law, there was no $30,000 encumbrance on the Ten Hoves home at the time it was sold, regardless of whether there was an enforceable obligation from the Ten Hoves to Banks. Thus, Johns' representation to the Trustee to the contrary was a materially false statement, and his convictions on counts one through three must stand.

### 2. Instructional Error

Johns next argues that even if we do not find that, as a matter of law, a legitimate mortgage securing a $30,000 obligation on the Ten Hoves' home existed at the time of its sale, it should still be up to the jury to determine whether such an obligation and security existed. If this is true, he argues, then the jury was not equipped to make such a determination, since the court refused to allow his proposed jury instructions explaining contract law and mortgage law in Wisconsin.

Since we hold today that, as a matter of law, no mortgage existed, no reasonable jury could find otherwise. Thus, submission of jury instructions including Wisconsin mortgage law were not necessary and, in any event, no prejudice could have resulted from their exclusion. *See United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010) ("[W]e will reverse [based on jury instructions] only if the instructions, when viewed in their entirety, so misguided the jury that they led to appellant's prejudice.").

### B. Count Four—Sufficiency of the Evidence

Under count four, Johns is alleged to have "knowingly and fraudulently received a material amount of property" "with the intent to defeat the provisions of title 11 of the United States Bankruptcy Code." Johns was found guilty on this count, and he now challenges the sufficiency of the evidence. Johns argues that he could not have intended to defeat the provisions of the Bankruptcy Code, since he helped all creditors get paid in full and helped the debtor

emerge from bankruptcy earlier than anticipated. The government, conversely, contends that one of the main purposes of the Bankruptcy Code is to help debtors get a "fresh start," and Johns, in stealing the Ten Hoves' equity, defeated that purpose. As discussed in Section III.A.1 above, "We evaluate the evidence in the light most favorable to the government, and if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' the judge committed no error in denying the motion for acquittal and we will affirm the conviction." *Douglas*, 874 F.2d at 1155 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Since it is clear that Johns received property from the Ten Hoves in the form of his broker's fee, the parties focus on whether or not Johns received such property with the intent to defeat the provisions of the Bankruptcy Code. We have very little case law on the specific provision at issue here—18 U.S.C. § 152(5)—but in discussing § 152 generally, we have stated:

> Section 152 of Title 18 is a congressional attempt to cover all of the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through any type of effort to keep assets from being equitably distributed among creditors.

*United States v. Goodstein*, 883 F.2d 1362, 1369 (7th Cir. 1989) (citing *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970)). *See also United States v. Persfull*, 660 F.3d 286, 294 (7th Cir. 2011); *United States v. Ellis*, 50 F.3d 419, 422 (7th Cir. 1995); COLLIER ON BANKRUPTCY, ¶ 7.02(5)(a)(iv) ("At a

minimum, this component requires the defendant to act in such a way as to intentionally effect a deviation from the distributions anticipated by title 11 liquidations, including both the priorities and the rule that claimants within a class share *pro rata*."). Johns argues that these sources illustrate the true purpose of 18 U.S.C. § 152(5)—to provide broad protection against people interfering with creditors rights under the Bankruptcy Code. In support of this contention, Johns also cites several prototypical § 152 cases, in which creditors or debtors attempt to hide or transfer assets so as to cheat the bankruptcy system and prevent the equitable distribution of a debtor's limited property. *See, e.g.*, *United States v. Arthur*, 582 F.3d 713 (7th Cir. 2009) (finding sufficient evidence to support a verdict convicting a couple of bankruptcy fraud when a husband transferred property to his wife in an attempt to hide the property from creditors); *Persfull*, 660 F.3d 286 (finding sufficient evidence to convict two brothers of bankruptcy fraud where one brother transferred property to another to keep the property out of the reach of creditors).

The government cites no cases in which an individual is found guilty of bankruptcy fraud despite the fact that all creditors received the full amount of the obligation that was owed to them. It nonetheless argues that under the Chapter 13 plan, the Ten Hoves only had to pay 70% of their debt to creditors, but after they sold their home to Banks, the creditors received 100% of the debt owed. The government argues that this contradicts one of the central purposes of the Bankruptcy Code, which is to give debtors a fresh start. *See In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir.

2002); *In re Andrews*, 80 F.3d 906, 909-10 (4th Cir. 1996); *In re Christensen*, 193 B.R. 863, 866 (N.D. Ill. 1996). According to the government, the jury could have found that there was no actual agreement between Banks and the Ten Hoves under which the Ten Hoves would have to pay back the inflated equity—$30,000—upon the sale of their home. Thus, they had a right to that equity, the government suggests, and its use to pay off their creditors at a higher rate than they would have paid under the Chapter 13 plan defeated the purpose of giving the Ten Hoves a "fresh start."

We are not persuaded by this argument. For one, in each of the cases that consider a debtor's "fresh start" to be of central importance to bankruptcy proceedings, 18 U.S.C. § 152 is not at issue. Further, a finding that the Ten Hoves did not agree to pass on their "equity" at the closing of the sale of their house would not be supported by the evidence. Arthur Ten Hove himself testified that he was aware of the fact that he would not keep any equity at closing. Thus, the money used to pay off the Ten Hoves' creditors was not money that they would have been able to keep otherwise; rather, it was a part of the manufactured equity that Johns and Banks created through their scheme. The Ten Hoves, therefore, were not in a worse position then if the bankruptcy proceeding went as planned, and their ability to have a "fresh start" was not interrupted.

This, however, does not end our inquiry, for we do accept the government's broader argument that Johns intended to defeat the Bankruptcy Code by disregarding the Trustee's role in the Ten Hoves' bankruptcy plan.

Pursuant to the Bankruptcy Code, the trustee or the Bankruptcy Court was supposed to approve of any sale of the Ten Hoves' property that was not a part of their bankruptcy payment plan. Johns was aware of this, and he was also told by a staff attorney in the trustee's office that the sale of the Ten Hoves' home was not approved. By continuing with the sale anyway, and thus flouting the dictates of the Bankruptcy Code, Johns intended to defeat the Ten Hoves' bankruptcy payment plan, and thus the Bankruptcy Code in general. This notion finds support in early 20th century case law interpreting a precursor to the current Bankruptcy Code. In *Knapp and Spencer Co. v. Drew*, the Eighth Circuit held, "The appellant in taking the money from the bankrupt after proceedings in bankruptcy had been instituted against him violated the spirit and purpose of the bankruptcy act by attempting to *prevent the administration* of the estate by the proper court. . . ." 160 F. 413, 416 (8th Cir. 1908) (emphasis added). While *Knapp* involved a prototypical bankruptcy fraud case—one in which a creditor seeks to gain more than he would under the bankruptcy plan, thus defeating the intent of equitable distribution—the violation is stated in broader terms, suggesting that any improper interference with bankruptcy proceedings could violate the provision at issue. Similarly, in *In re Payman*, the Second Circuit held that "whoever prevents [the administration of a bankrupt estate] *even by equal distribution* to those assumed to be creditors frustrates the proceeding." 40 F.2d 194, 195 (2d. 1930) (emphasis added). The relevancy of these cases is obviously lessened by their age, but the

point is as cogent now as it was then: the Bankruptcy Code envisions that a trustee will administer an individual's plan to reorganize, and if a third party attempts to operate outside of that prescribed method, the Bankruptcy Code is frustrated.

Johns' actions were similar to those of the appellants involved in *Knapp* and *Payman* in that they directly contradicted the planned administration of the Ten Hoves' estate. While some of the central goals of the Bankruptcy Code were still upheld by the sale of the Ten Hoves' home (i.e., the payment of creditors and the removal of the Ten Hoves from Bankruptcy Court), the planned administration of the Ten Hoves' estate was knowingly interrupted by Johns, and thus it is fair to say that he intended to defeat the provisions of Chapter 11. We therefore find the evidence sufficient for the conviction of Johns under count four.

## C.  Sentencing

Johns challenges two findings regarding his sentencing guidelines range: the calculation of the loss amount attributable to his crimes under United States Sentencing Guideline ("U.S.S.G.") § 2B1.1 and the vulnerable victim enhancement added to his guidelines range under U.S.S.G. § 3A1.1. He puts forth two arguments regarding his loss calculation. First, he claims that there should not be a loss amount attributable to his crime at all, since the alleged "equity" lost by the Ten Hoves, the Spellers, and Ms. Coleman was not real,

but rather was simply manufactured equity from the inflated home prices created by Johns and Banks' scheme. If we do find that a loss amount is appropriate for the sales, however, Johns argues that he did not have enough of an involvement in the sale of the Spellers' home to have the loss involved in that transaction added to his total loss amount. In his challenge to the vulnerable victim enhancement, Johns argues that the sellers involved in Johns' scheme should not be considered "victims," since, again, they did not loss anything due to the scheme. He also contends that financial strain is not enough to make a victim vulnerable, nor can a victim be vulnerable because he is particularly unsophisticated. The district court rejected each of these arguments at Johns' sentencing hearing, and Johns' guidelines range was determined to be 41 to 51 months (up from 15-21 months without the loss amount and vulnerable victim enhancements). The government, however, advocated for a four-level reduction in Johns' guidelines calculation under 18 U.S.C. § 3553(a), reasoning that Johns should not be held accountable for the loss that resulted from the sale of the Spellers' home. The government appears to have changed course, however, since it now contests Johns challenge to the inclusion of the Speller sale in calculating his sentencing guidelines range. The court did not explicitly agree to the government's recommendation, but did depart downward from the guidelines range, giving Johns a sentence of thirty months. We now consider Johns' challenges to that sentence.

## 1. Loss Calculation

Before turning to the district court's general loss amount calculation, we will decide whether one of the three sales at issue—Banks' purchase of the Spellers' home—should be included in determining the loss amount for Johns' guidelines calculation (assuming an actual or intended loss resulted from the sale).[4] Whether a particular loss should be included in a guidelines calculation depends upon "(1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant

---

[4] We note that Johns may have had an argument that the Coleman and Speller sales do not meet the definition of "relevant conduct" in relation to Johns' bankruptcy fraud charges, and thus should not have been considered in calculating Johns' sentencing guidelines range. Since Coleman and the Spellers were not in bankruptcy, it is questionable whether the Coleman and Speller sales "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Then again, U.S.S.G. § 1B1.3(a)(2) construes some conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction" as relevant conduct, and thus may allow for the Coleman and Speller sales to be considered relevant conduct. In any event, Johns has not challenged his guidelines range on the basis of U.S.S.G. § 1B1.3(a)(1), and thus has waived any argument of this nature. *See United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002) ("[A]ny issue that could have been but was not raised on appeal is waived and thus not remanded.").

in connection with that criminal activity." *United States v. Aslan*, 644 F.3d 526, 536-37 (7th Cir. 2011) (citing *United States v. Salem*, 597 F.3d 877, 884–86 (7th Cir. 2010)). Since Johns had participated in a scheme nearly identical to that perpetrated upon the Spellers, and Johns was a part of the attempt to buy the Spellers' home at the front end of the scheme, he could clearly foresee any loss that occurred pursuant to the sale. The only question, therefore, is whether the sale was in furtherance of jointly undertaken criminal activity, as it relates to Johns. We review the determination of whether the sale was in furtherance of jointly undertaken criminal activity for clear error. *United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir. 2000).

Johns argues that the district court only considered foreseeability, and did not analyze whether the sale was in furtherance of joint activity between himself and Banks. He reminds us that he did not serve as broker to the deal, nor did he receive his normal broker's fee. Johns likens his participation in the overall scheme to the defendant described in U.S.S.G. § 1B1.3, App. n. 2(c)(5). In that example, the guidelines describe the girl-friend of a drug-dealer who makes a single drug delivery at his request because he is ill. *Id*. The guidelines suggest that she should only be held accountable for the single sale and not additional sales made by her boyfriend, since the other sales were not in furtherance of jointly undertaken activity. *Id*. The district court and the government discuss several facts suggesting that Johns was, in fact, more "involved" in the Speller sale than he claims. For one, the sale took

place only eight days after the sale of the Coleman house—a sale that was undoubtedly a part of Johns' scheme. Johns also originally offered to purchase the Spellers' house, but backed out of the deal before it went through. John could (but does not) argue that this is evidence of his repudiation of the crime, but the fact is, his offer and subsequent balk could have aided in convincing the Spellers to sell their home to whoever was willing to buy it and at whatever price. The government also points out that Johns was a signatory on the account in which the funds from the Speller sale were deposited, though there is no evidence that Johns used those funds. Finally, the court discusses the fact that Johns taught the scheme to Banks, making Johns partially responsible.

We agree with Johns that a criminal who teaches another criminal how to commit a given crime should not be on the hook for every subsequent scheme that the apprentice executes. This scheme, however, is not an isolated fraud with which Johns had no contact. It is arguable that Johns actually initiated the scheme, since Cooper approached him initially to purchase the Spellers' home. Johns had access to the scheme's profits, whether or not he took advantage of that access. Johns' interaction with the Spellers may have driven down the price at which they would be willing to sell their home. While it may be a close call as to whether any loss attributable to the sale ought to be added to Johns' loss amount, it was not clear error for the court to make such a finding. What remains to be determined, however, is whether Johns caused,

or intended to cause, any loss to the Spellers, the Ten Hoves, or Ms. Coleman at all.

We review what constitutes a loss de novo, and the loss determination itself for clear error. *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005). It is the government's burden to prove the loss amount by a preponderance of the evidence. *United States v. Schroeder*, 536 F.3d 746, 752-53 (7th Cir. 2008). Under § 2B1.1, App. n. 3(A), the loss attributable to culpable activity is the greater of the actual loss or intended loss. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss, under the guidelines, means "the pecuniary harm that was intended to result from the offense; and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* At Johns' sentencing hearing, both of the parties and the district court agreed that if Johns' scheme caused a financial loss, it was the result of the homeowners' inability to access equity that they had in their homes. The question we must answer, therefore, is whether Johns, by way of his scheme, prevented any of the homeowners from accessing equity they had in their homes or intended to prevent such access.

The government argued to the district court (and continues to argue) that the original payment price for each home, before any "equity" was rinsed back to Banks, represented the fair market value, and that each homeowner had a right to that equity. Since Banks took that equity for himself, the government argues, each homeowner suffered a loss. Johns counters by arguing that each homeowner was in foreclosure,

and thus the amount of money that each home could have fetched in a fair and open market was irrelevant. He contends that the imminent prospect of a forced sale reduced the purchase price of each home, and thus the homeowners did not have any positive equity. Since the homeowners could not access the fair market value, Johns asserts, there was no equity to lose, and therefore no loss attendant to his scheme.

In calculating Johns' guidelines loss calculation, the district court seemed to split the difference between the two parties' positions. Though the entire point of the scheme at issue was to inflate the price of homes in foreclosure, the district court found that the fraudulently augmented prices represented the fair market value of each home.[5] With regard to the sale of the Coleman home and the Ten Hoves home, however, the district court found that there was no actual loss suffered by the homeowners. The court found that the financial positions of Coleman and the Ten Hoves prevented them from selling their home for its fair market value, thus restricting their access to whatever equity they may have had in their homes under different circumstances. Since, but for the scheme, these homeowners could not have accessed their homes' equity anyway, the court found that

---

[5] This conclusion may be based on the fact that Banks' lender approved the facial purchase price for each home, thus lending some credence to the notion that each home could have sold for that amount. As our analysis will show, however, it is unimportant whether or not the fraudulent purchase prices represented the fair market value of each home.

they suffered no actual harm due to Johns' actions.[6] Despite the lack of any actual harm to the Ten Hoves or Coleman, however, the district court found it to be "clear and undisputed that the intended loss was the amount of equity that could be manufactured out of people like the Ten Hoves, who couldn't extract that equity under their conditions." The court agreed with Johns that "in the real world there wasn't any equity that [the Ten Hoves] had except for that which was created by the fraud," but nonetheless concluded that the manufactured equity was an intended loss "because the proceeds were used for purposes that the Defendants put the proceeds to."

The district court's findings regarding the Speller sale were not quite so clear. In one portion of the transcript, the court stated that "when we look at the Ten Hoves, and we look at Coleman, and the others, the Spellers, for them the equity wasn't there." Directly after concluding that Coleman and the Ten Hoves did not suffer any actual loss as a result of Johns' actions, however, the court stated, "I believe there was some equity that could be argued existed in the property for the Spellers," suggesting that the Spellers did, in fact, experience an actual loss caused by the scheme. It would therefore seem that the district court found both an actual and intended loss with regard to Banks' purchase of the Speller home.

---

[6] In fact, the court suggested that the Ten Hoves may have benefitted from Johns' scheme, since they were able to avoid foreclosure and end their bankruptcy proceedings.

With regard to the sale of the Ten Hoves and the Coleman homes, we agree with the district court's conclusion that the homeowners suffered no actual loss, but disagree that there was an intended loss attendant to the scheme. To begin with, the notion that a fraudulent scheme aimed at inflating the price of a house can set the house's fair market value is seriously flawed, but given the circumstances that each of the homeowners found themselves in, the "fair market value" of their homes were irrelevant. As the Supreme Court explained in *BFP v. Resolution Trust Corp.*, "market value, as it is commonly understood, has no applicability in the forced-sale context," since "property that *must* be sold within those strictures is simply *worth less*." 511 U.S. 531, 537-39 (1994) (emphases in original). *See also United States v. Buchman*, 646 F.3d 409, 412 (7th Cir. 2011) (observing that in the case of real estate sales, "[a]n extended search may be required to achieve the asset's full value, because it takes time for news to reach the person who can make the best use of the asset"). Thus, the homeowners had no claim to their homes' fair market value, since they were all facing the possibility of foreclosure and a forced sale of their property. It is therefore irrelevant whether or not Banks' purchase price for each home, before the "equity" was returned to him, was equal to the home's "fair market value." The record is devoid of any evidence of what each home would have fetched in a forced sale, and thus the government cannot contend that, but for Johns' scheme, the homeowners would have been in a better financial situation.

Moreover, even if there were evidence that a forced sale would have netted the homeowners a greater amount of

money than they ended up with after the Banks sales,
this would not necessarily mean that the homeowners
suffered a loss as a result of the scheme, since they
each had good reason to strike a deal with Johns and
Banks. By agreeing to sell their homes to Banks and to
return to Banks any "equity" that remained, each home-
owner avoided the negative effects of going through a
foreclosure proceeding, such as a lower credit rating. They
also had the guarantee, instead of the mere hope,
of receiving enough money to pay off their lenders. In
the case of the Ten Hoves, they were able to exit bank-
ruptcy early, with all of their debts paid off. Indeed,
the district court observed that the Ten Hoves actually
benefitted from the scheme. Thus, even if a foreclosure
and a forced sale would have resulted in a higher
net purchase price for each of the homeowners, there
were benefits to accepting Johns and Banks' proposal
that remained even after the curtain was lifted on
the scheme. Thus, considering the factual findings of
the district court—which, by all indications, were not
clearly erroneous—neither Coleman nor the Ten
Hoves suffered an actual loss caused by Johns and
Banks' scheme.

Nor did Johns intend for there to be a loss in brokering
Banks' purchase of the Coleman and the Ten Hoves homes.
As Johns points out, he and Banks were successful in
their scheme (except for the fact that they were caught),
and no loss occurred. How, then, could they have
intended for loss to occur? The confusion must stem from
the faulty supposition that ill-gotten gains must have
caused someone a loss, but as we have stated before,
"intended losses are intended losses, not bookkeeping

entries. *United States v. Peel*, 595 F.3d 763, 773 (7th Cir. 2010). It is not enough that a criminal expect a pecuniary gain—he must foresee that his victim will actually suffer pecuniary loss.[7] *See* U.S.S.G. § 2B1.1 App. n. 3(A)(ii) ("'Intended loss . . . means the pecuniary harm that was intended to result from the offense"). In *United States v. Schneider*, for instance, a couple fraudulently obtained government contracts through collusive bidding. 930 F.2d 555, 556-57 (7th Cir. 1991). We held that the "victim"—in that case, the government—did not suffer a loss at all, since it obtained contracts for a lower price than it would have from competing contractors, and thus an enhancement based on a loss amount was improper. *Id.* at 558-59.

The same principle applies in this case: unless the Ten Hoves (and the other homeowners) would have been in a better financial position but for Johns' scheme, they did not suffer a loss. Similarly, unless a foreseeable result of the scheme was the placement of the Ten Hoves in a worse financial position than if they did not sell their house to Banks, no loss was intended. The fact that the difficult financial positions of the Ten Hoves and Coleman permitted Johns to enact his scheme does not necessarily mean that the scheme was designed to financially harm the homeowners.[8] Both the Ten Hoves and Coleman agreed to Johns and Banks' offer to purchase

---

[7] It is true that ill-gotten gains can sometimes be counted as a "loss", but such a substitution can only be made "if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 App. n. 3(B)

[8] In fact, Johns' scheme worked best when Banks' purchase of a home was the seller's best option, rinsed equity notwithstanding.

their home because, given the homeowners' financial straits, it was the best option available to them. The fact that Johns lied to the Bankruptcy Trustee, or even that he lied to the Ten Hoves about Fledderman's "mortgage" on their home, does not change this fact—they received precisely what they agreed to, and agreed to for good reason. Thus, neither a loss to the Ten Hoves nor a loss to Coleman was a part of the scheme, and such a loss was never intended. We therefore reverse the district court's finding of a loss amount based on the sale of the Ten Hoves and the Coleman homes in calculating Johns' sentencing guidelines range.

Given the district court's separate factual findings regarding the sale of the Spellers' home, the potential existence of a loss amount incident to that sale is more difficult to assess. As with the Ten Hoves, the Spellers were in financial distress and their home was in fore-closure proceedings when they sold their home to Banks. The district court nonetheless found that, unlike the Ten Hoves and the Coleman homes, the Speller home had some equity at the time of sale, but the district court does not explain how it came to this conclusion. The answer may lie in some of the factual differences between the Speller sale, on the one hand, and the Ten Hoves and Coleman sale on the other. The record indicates that the Spellers did not believe they were selling their home outright, with no future rights to the property. Under their understanding of the agreement, the equity that was "rinsed" back to Banks at the time of sale was supposed to be used solely for their benefit, through the payment of the mortgage, of taxes, and for repairs. Further, the Spellers

believed that they had an option to repurchase the residence. Thus, the district court may believe that the Spellers were duped into giving up the equity they had in their house (which could have been accessed through a forced sale) in order to gain the advantages proposed by Johns and Banks—an option to repurchase and equity used for their benefit.

It is not clear from the transcript if the district court did, in fact, believe that the Spellers actually lost equity that they had access to by falling victim to Johns and Banks' scheme. On remand, we leave it to the district court to clarify whether the Spellers did suffer an actual or intended financial loss due to Johns' actions, in light of our analysis of the Ten Hoves and Coleman sales.

### 2. Vulnerable Victim Enhancement

The district court applied a two-level enhancement to Johns' sentence for targeting vulnerable victims. More specifically, it found that Johns targeted unsophisticated homeowners in financial distress. The court also noted that no financial loss is necessary for a vulnerable victim enhancement to apply, though this point was unimportant given the district courts finding of intended loss to all three homeowners. Johns argues that under our case law, financial vulnerability is not enough to trigger the vulnerable victim enhancement, even when coupled with an unsophisticated, "blue collar" background. Further, Johns again argues that there was no loss in this scheme, at least with respect to the

homeowners, and thus there could not have been any victims. The government contends that no financial loss is necessary for a vulnerable victim enhancement to apply, and that financial strain can be sufficient to make a victim vulnerable to fraud.

Given our conclusion that Coleman and the Ten Hoves did not suffer an actual or intended loss, and that the Spellers may not have suffered a loss, we must determine whether Johns is correct in his assessment that none of the homeowners can be considered victims of Johns' relevant conduct. We also must determine which of the three homeowners could be considered "vulnerable" if any of them can, in fact, be considered a victim. In reviewing vulnerable victim findings, we have observed that district court judges are in a particularly good position to make this determination. *United States v. White*, 903 F.2d 457, 463 (7th Cir. 1990). We review the finding for clear error. *United States v. Christiansen*, 594 F.3d 571, 574 (7th Cir. 2010).

Under § 3A1.1, app. n. 2, the vulnerable victim enhancement should be applied where there is a person "(A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Only one victim must be vulnerable in order for the enhancement to apply, *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003), and the victim must be chosen because of his vulnerability. *United States v. Porcelli*, 440 Fed. Appx. 870, 878 (11th Cir. 2011).

We first address Johns' argument that there were no victims to this scheme as defined in the sentencing guidelines, and thus there could not have been any *vulnerable* victims. As the government points out, we observed in *Stewart* that "[t]here is no requirement in section 3A1.1 that a target of the defendant's criminal activities must suffer financial loss." *United States v. Stewart*, 33 F.3d 764, 770 (7th Cir. 1994). In *Stewart*, a fraud was perpetrated upon several elderly people by the president and operator of an insurance firm. *Id.* at 766. The fraudster sold annuities that were meant to supply funds for the purchasers' funeral arrangements, but the defendant instead pocketed their payments, and paid for funeral arrangements by way of a pyramid scheme. *Id.* The funeral homes involved in the scheme were contractually obligated to provide funeral services, and thus the purchasers' were not at risk of losing what they paid for. *Id.* Rather, it was the funeral homes that were at risk of suffering a loss. *Id.* We held, however, that the purchasers were still victims in that they were made to be instrumentalities of a fraud, and that no financial loss was necessary under the vulnerable victim enhancement. *Id.* at 770-71. We based this holding on *United States v. Newman*, 965 F.2d 206 (7th Cir. 1992). In *Newman*, the defendant used a 21-year-old woman to help him defraud her family out of money, and maintained his control over her through rape, threats and drugs. *Id.* at 207-08. We held that the woman in *Newman* was a vulnerable victim of the defrauder despite the fact that she was not the individual that was financially defrauded. *Id.* at 212. Accordingly, we held in *Stewart* that the elderly annuities

purchasers could be vulnerable victims of the defrauder's crimes despite the fact that they did not actually suffer financial loss, since, again, they were made to be the instrumentalities of the fraud. 33 F.3d at 770.

We also cited two analogous cases from other circuits for support in *Stewart*. In *United States v. Bachynsky*, the patients of a doctor convicted of defrauding insurance companies were considered vulnerable victims by the Fifth Circuit despite the fact that they did not suffer financial loss. 949 F.2d 722, 735-36 (5th Cir. 1991). The Fifth Circuit, similar to the panel in *Stewart*, pointed to the fact that the patients were made to be instrumentalities of the doctor's fraud, but it also suggested that the doctor provided unnecessary or risky treatment that could have actually been harmful to his patients. *Id*. The Eleventh Circuit, in *United States v. Yount,* held that elderly account-holders who had money misappropriated by a bank employee were vulnerable victims despite the fact that they were reimbursed for their losses, and thus, on balance, did not suffer financial loss. 960 F.2d 955, 957-58 (11th Cir. 1992). Contrary to our reasoning in *Stewart*, however, the Eleventh Circuit relied on the fact that the account holders in *Yount* did suffer an actual loss, and were merely reimbursed, much like the victim of a burglar that has insurance. *Id*.

A district court in Kansas has disagreed with our analysis in *Stewart*. *See United States v. Anderson*, 85 F.Supp.2d 1084, 1092 (D. Kan. 1999). That court held that the vulnerable victim enhancement could only apply if the "victim" suffered actual or intended harm or loss. *Id*. at 1091-93.

The district court reasoned that our reliance on *Newman* in *Stewart* was misplaced, since in *Newman*, the rape victim suffered actual harm, albeit not financial, whereas the elderly annuities purchasers in *Stewart* did not suffer any actual or intended harm. *Id.* at 1092. Further, the court did not believe that an innocent person being used as an instrumentality in someone else's fraud constitutes a harm or loss, as we suggested in *Stewart*. *Id*. The Kansas court distinguished *Bachynsky* and *Yount*, the out-of-circuit cases we relied on in *Stewart*, by the fact that the instrumentalities of fraud in those cases experienced actual harm as well. *Id*. Thus, the court concluded that an instrumentality of a fraud that suffers no actual or intended harm cannot be a vulnerable victim. *Id*.

As the Kansas district court pointed out in *Anderson*, this discrepancy can potentially be explained by a change to the sentencing guidelines that occured post-*Stewart*. *Anderson*, 85 F.Supp.2d at 1092-93. Being made an instrumentality of a fraud may have been enough to render one a victim under the version of U.S.S.G. § 3A1.1 in place at the time we decided *Stewart*. Under the guidelines that were in place in 1994, the vulnerable victim enhancement was used when a vulnerable victim "[was] made a target of criminal activity." *See* U.S.S.G. § 3A1.1, App. n. 1 (1994); *see also Anderson*, 85 F.Supp.2d at 1092-93. Under the current version of the guidelines, however, a person must be a victim of "the offense of conviction" or "any conduct for which the defendant is accountable," U.S.S.G. § 3A1.1, App. n. 2 (2011), in order for the enhancement to apply, and there

is no mention of "targets" of crime. Perhaps a person who has suffered no harm as a result of a fraudulent scheme, but was nonetheless made an instrumentality to that scheme, could be considered to have been "made a target of criminal activity," U.S.S.G. § 3A1.1, App. n. 1 (1994), but we agree with the *Anderson* court that the very same person cannot be deemed a victim under the current guidelines. *Accord United States v. Salahmand*, 651 F.3d 21, 29-30 (finding the vulnerable victim enhancement to be proper for a fraudulent physician, and distinguishing cases involving those who "suffered no injury at all," thus failing to "qualify as 'victims' under any definition"); *United States v. Gieger*, 190 F.3d 661, 664-65 (5th Cir. 1999) (finding that patients who received free ambulance rides due to the ambulance company's falsification of reports were not victims of the company's fraud, and thus a vulnerable victim enhancement was not appropriate). Thus, the vulnerable victim enhancement was inappropriate to the extent that it was based on the Ten Hoves and Coleman being labeled as "victims," and unless the district court finds that the Spellers experienced some actual or intended harm, the vulnerable victim enhancement was inappropriate altogether.

If it turns out that the Spellers did experience a loss, we must determine whether they were vulnerable, and thus the enhancement was nonetheless proper. Johns argues that financial distress is not enough to trigger the vulnerable victim enhancement. For support, he cites several cases in which victims are in financial straits *and* have additional vulnerabilities. *See, e.g.*, *United States v. Fiorito*, 640 F.3d 338, 351 (8th Cir. 2011)

(where victims were found to be vulnerable due to financial distress *and* additional factors, such as age and alcoholism). While the government does not cite any cases directly on point from the Seventh Circuit, several other circuits have held that the precise opposite of Johns' contention is true—financial distress alone is enough to make one vulnerable to financial fraud crimes. *See Porcelli*, 440 Fed. Appx. 870, 878 (finding vulnerable victim enhancement was appropriate when people were targeted because of the financial distress of being in danger of losing their homes); *United States v. Arguedas*, 86 F.3d 1054, 1058 (11th Cir. 1996) ("A victim's vulnerable financial situation may alone serve as the basis of a section 3A1.1 enhancement . . . ."); *United States v. Zats*, 298 F.3d 182, 188 (3d Cir. 2002) ("Financial vulnerability is one way a victim can be 'otherwise particularly susceptible.' "). While there is no case law as directly on point in the Seventh Circuit, we have stated that "[d]efrauders who direct their activities . . . against people who because of mental or educational deficiencies *or financial desperation* are suckers for offers of easy money" trigger a vulnerable victim enhancement. *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999). We now clearly hold that financial desperation is enough to make one vulnerable to financial crimes. Since the Spellers were in a position to lose their home at the time of their transaction with Banks and Johns, they would suffice as financially vulnerable, and thus should trigger the enhancement if they are deemed by the district court to have suffered a financial loss.

### 3.  Further Enhancements on Remand

The record makes clear that, throughout the proceedings in the district court, the parties were conflicted on how to label the fraud perpetrated by Johns—as bankruptcy fraud, with the Ten Hoves as the victims; as bank fraud, with Banks' lenders as the victims; or both. The record before us is unclear as to whether the government, in the district court, presented alternative arguments regarding possible guidelines enhancements in the event that the district court viewed Banks' lenders as victims of the scheme at issue. If the government did make such alternative arguments, and the district court, due to its view of the case, did not reach those arguments, then the arguments are preserved and can be argued on remand. *Cf. Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 936 (7th Cir. 1998) ("Because the district court did not reach the issue of whether the plaintiffs' remaining claims are viable and the parties have not briefed that issue on appeal, we remand that issue to the district court for its consideration in the first instance."). If the arguments were not made at Johns' original sentencing hearings, the arguments for further enhancements have been waived. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

### III.  Conclusion

For the reasons set forth above, we AFFIRM in part and REVERSE in part the judgment of the district court,

and REMAND for further proceedings consistent with this opinion.