In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3240, 12-1207, & 12-1295

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES WHITE, NORTON HELTON, AND FELICIA FORD,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 CR 763 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 20, 2013 — DECIDED DECEMBER 13, 2013

Before WOOD, *Chief Judge*, and FLAUM and BAUER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Charles White, Felicia Ford, and Norton Helton were three players in a major mortgage fraud scheme. Charles White was the scheme's mastermind and principal. Through fraudulent mortgage loan applications, he obtained financing for straw purchasers to buy properties from homeowners on the brink of foreclosure. Unbeknownst to the owners, White's goal was not to save their homes, but

instead to strip the properties of their equity for his own gain. Felicia Ford was the closing agent. Though she was supposed to act as the lender's representative in the transactions, she instead fabricated official documents to facilitate White's scheme. Norton Helton was the attorney. At White's behest, Helton "represented" the homeowners during the closings—that is, he falsely assured clients that everything was in order while pocketing legal fees paid out of the equity proceeds. Helton also orchestrated the scheme's cover-up by representing the homeowners in their subsequent bankruptcy filings. All three players were convicted of multiple counts of wire fraud for their participation in the scheme; Helton was also convicted of bankruptcy fraud. The three defendants now appeal a multitude of substantive and procedural issues stemming from their trial and, in White's case, his sentence. We affirm on all issues.

## I. Background

Defendant White owned and operated Eyes Have Not Seen ("EHNS"), a company that offered a "mortgage bailout" program to insolvent homeowners in the Chicago area.[1] EHNS told these homeowners that they could stave off foreclosure by transferring their homes to EHNS "investors" for a one-year period. EHNS represented that the investors would pay the property's mortgage; the owners could then continue to live in their home, take the year to improve their financial health, and reassume their mortgage obligation at

---

[1] The company's name references *1 Corinthians* 2:9: "But as it is written, Eye hath not seen, nor ear heard, neither have entered into the heart of man, the things which God hath prepared for them that love him."

the program's conclusion. In reality, however, EHNS investors would take title to the home outright. White would pressure EHNS's appraisers to assess the properties at amounts higher than their actual value. Then, EHNS would strip both the available and manufactured equity from the property in the form of transaction fees. The clients almost always were unable to buy back their homes at the conclusion of the one-year program. Eventually, lenders foreclosed on many of the properties.

EHNS advertised on gospel radio stations and solicited clients through public foreclosure lists. Many clients testified that they did not fully understand the transactions they were participating in. White and EHNS employees often did not explain that the homeowners would actually *sell* their properties to a third party. Instead, clients were told that they would be temporarily "transferring" their homes in a way that would preserve their ownership rights, or that they would co-own the property with the investor.

White and EHNS employees recruited the investors—i.e., the straw purchasers—by paying them an amount per transaction. Sometimes, they used a client's family member instead. White was responsible for obtaining the requisite mortgage financing for the property's purchase. He accomplished this by submitting fraudulent loan applications to lenders. White's common tactics included lying about the investor's employment history (usually by stating that the investor was employed by EHNS or another of White's companies), inflating the investor's assets, and including incorrect bank account information. White also falsely represented to the lenders that the investors planned to live in the property. To conceal his role in these applications, White

would prepare and submit applications under several different aliases.

Once the lenders gave the loans preliminary approval, they wired the loan funds to an escrow account at Title Zone, L.L.C. White had helped create Title Zone, and the company's Chicago branch shared an office suite with EHNS. Defendant Ford was a closing agent at Title Zone who had been hired on White's recommendation. Ford performed many of EHNS's transactions. As a closer, Ford served as a representative for the mortgage lender. Ford was supposed to follow the lender's closing instructions, ensure that all of the lender's conditions were met, and submit the required documents to the lender for approval. Only then would the lender authorize release of the loan funds from the escrow account, which Ford could then distribute to the parties.

Ford used her position to contribute to the scheme's success in several ways. For one, Ford (or her assistant) would prepare two versions of the required HUD-1 settlement statements: a version to be submitted to the lenders, and a version for the transacting parties. The version for the homeowners and investors would contain true information about the amount of EHNS's fees. The version that Ford submitted to the lenders, however, omitted these fees. In addition, Ford would accept a cashier's check for the mortgage's down payment from White—despite her knowledge that White was not the purchaser. Ford would nonetheless represent to the lender that the investor had been the one to provide the funds. And in some transactions, Ford would arrange for EHNS to receive the loan proceeds before White made the down payment. Ford (or her assistant) would cre-

ate what looked like a photocopied image of the investor's down-payment check by cutting and pasting the information for the current transaction onto an image of a cashier's check from a previous transaction. Ford would fax the fabricated check image to the lender to get the bank to release the loan funds, but she would delay sending the actual check. This allowed White to subsequently draw upon the loan funds to cover the down payment. For her services, Ford received kickbacks from White and EHNS in the form of "bonuses" and other payments.

Then there was defendant Helton. EHNS clients were told that Helton, a real estate attorney, would be present at the transaction's closing to represent them. Usually the clients would not meet Helton before the day of the closing. When clients asked questions, Helton described the mortgage bailout program in the same terms as EHNS—that is, he did not tell the homeowners that they were selling their home outright. He would also assure hesitant clients and investors of the paperwork's accuracy, and on at least one occasion he discouraged a homeowner from reading the documents herself.

Clients were told that EHNS would use the loan proceeds to pay their mortgage for a year. EHNS usually fulfilled this promise, but White withdrew more equity from the sale than was necessary to cover the mortgage and EHNS's costs. In fact, EHNS usually took all of the available equity in the form of large fees—for EHNS, for White's loan officer commissions, and for Helton's legal services. The clients were often unaware that EHNS was taking these fees.

Next came the bankruptcy filings. White and EHNS employees told clients that they needed to improve their credit

so that they could reassume their mortgages at the program's conclusion. They referred clients to Helton, who told them that they could restore their financial health by filing for Chapter 7 bankruptcy; sometimes he pressured them to do so. During his clients' bankruptcy proceedings, Helton took steps to prevent the trustee, their creditors, and the court from discovering that the debtors had recently sold their homes through the bailout program. When Helton and his staff filed petitions and asset schedules on behalf of clients, they omitted any reference to the EHNS sales or the properties in question—even when Helton had been personally present at the property's sale. Helton also coached his clients before their § 341 meetings of the creditors to tell the trustee that the client had never owned real estate, or else to say that the client lost the property in foreclosure. When his clients followed his instructions and lied, Helton did not correct the false representation. When one client told the trustee the truth about having recently owned property, Helton became angry with her. And when a trustee did learn of a debtor's recent EHNS transaction, Helton lied and said that he was personally unfamiliar with the program.

Helton also carried out a side scheme using his own "mortgage bailout" company, Diamond Management. Helton employed virtually the same tactics as White and EHNS: he recruited straw purchasers, he provided the down payment checks himself, he used Ford and Title Zone's services

at the closings, and he encouraged his clients to file for Chapter 7 bankruptcy afterward.[2]

Eventually, the authorities caught on, and Helton was charged with bankruptcy fraud. This led to the unraveling of the whole EHNS scheme. The federal grand jury returned a fourth superseding indictment in March 2010 charging White, Ford, and Helton with multiple counts of wire fraud in violation of 18 U.S.C. § 1343, and Helton with multiple counts of bankruptcy fraud in violation of 18 U.S.C. § 157.

The three defendants went to trial that year. (We will re-lay additional background regarding the events at trial in our discussion of each claim of error.) White was convicted of seven counts of wire fraud. Ford was convicted of five counts of wire fraud and acquitted on two counts. Helton was convicted of three counts of wire fraud and eight counts of bankruptcy fraud. Helton and Ford filed motions for ac-quittal, and all three defendants moved for a new trial. The district court denied all motions, and sentenced White to 266 months imprisonment, Helton to 180 months, and Ford to 48 months.

This appeal followed.

---

[2] One of Helton's three wire fraud counts concerns a Diamond Manage-ment transaction; the other two counts arose out of Helton's involvement with EHNS transactions.

## II. Discussion

Once we pool the three defendants' arguments, they have offered nearly a dozen distinct grounds for reversal.[3] So we have a lot of ground to cover. We will first dispose of Ford and Helton's sufficiency arguments, and then proceed with all three defendants' claims of error in roughly the order in which the issues arose during trial and sentencing.

### A. Sufficiency of the evidence against Ford

First, Ford challenges her wire fraud conviction. We review the district court's denial of Ford's motion for acquittal de novo. *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011). Nonetheless, in considering sufficiency-of-the-evidence challenges, we "view the evidence in the light most favorable to the prosecution," and then "ask whether any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Id*. Here, we answer that question in the affirmative.

Ford contests her conviction on the theory that the fraudulent transactions were always completed before she became involved. She argues that the relevant wire transmissions—i.e., the transfers of the loan funds from the mortgage lender to the escrow account at Title Zone—always occurred before the closings. At the time of the closing, she maintains, the lender had already approved the loan on the

---

[3] We asked the defendants to avoid redundancy in their briefing by joining each other's arguments, and they obliged. As we ultimately find no grounds for reversal, we see no need to specify which defendant adopted which argument.

basis of White's fraudulent mortgage application. Thus, once the wire transfers took place, the scheme was complete; Ford says her contributions during the closings consisted of entirely separate conduct dealing only with the scheme's "proceeds."

But Ford's understanding of wire fraud is mistaken. To establish a violation of 18 U.S.C. § 1343, the government must prove that Ford participated in a scheme to defraud, that she intended to defraud, and that an interstate wire was used in furtherance of the scheme that she participated in. *See United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009). There is no requirement that Ford personally cause the use of the wire. *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008). Rather, the third element of wire fraud is met if the use of a wire "will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)). The jury could easily conclude that Ford, an experienced closing agent for a title company, would be aware that wire transfers would routinely take place in a scheme involving loaned funds. *Cf. United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012) (finding it "well within reason for the jury to conclude that [the defendant], given his involvement in the real estate market, could reasonably foresee that lending banks would use wire transfers to transmit loan proceeds in the course of real estate transactions").

Moreover, the timing of the wire transfer does not determine the scheme's end-point. The transfer is merely a jurisdictional prerequisite for the federal statute's application. For that reason, the transfer need not be the scheme's objec-

tive; it need only be "a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (alteration in original).[4] Here, the transfer of the loan funds from the mortgage lender to Title Zone was just an intermediate step—the EHNS scheme was not complete until the defendants had the proceeds in their pockets. For this to happen, EHNS needed Ford to act as the closing agent and submit the proper (or rather, improper) documentation to the lender. Only once the lender was satisfied that everything was in order would it authorize the release of the funds from the escrow account, and only *then* could White and Helton enjoy the equity payouts that Ford distributed to them. Ford's contributions during the closings—her drafting the false HUD-1 settlement statements, her failure to tell the lenders that the buyer was not the one providing the down payment, and her fabricating the cut-and-pasted cashier's checks—were integral to the scheme's success. The fact that these contributions happened to take place after the wire transfer is immaterial to her culpability.

The government established that Ford was an integral participant in a scheme to defraud in which the use of a wire was foreseeable. Accordingly, her challenge to the sufficiency of the evidence fails.

---

[4] Though we are discussing wire fraud, we may draw upon reasoning from mail fraud cases, as "cases construing the mail fraud statute [18 U.S.C. § 1341] are applicable to the wire fraud statute [18 U.S.C. § 1343]." *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir. 1987).

### B. Sufficiency of the evidence against Helton

### 1. Wire fraud

Helton challenges his wire fraud convictions on the theory that there was insufficient evidence supporting his intent to defraud. "Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002). This may be established "by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive." *Id.*

Helton was convicted on three counts of wire fraud. With respect to the two counts involving an EHNS transaction, Helton argues that he was an unknowing bystander who got mixed up in White's scheme. By his account, Helton agreed to represent EHNS homeowners in real estate transactions, but he had no idea that White and Ford's methods were not aboveboard. But the jury found otherwise. This is not surprising, as there was overwhelming evidence from which it could conclude that Helton knew what was going on and furthered the scheme's success for his own gain.

First, Helton was present at the EHNS closings. All of the closing documents, including the loan applications and HUD-1 settlement statements, were available for Helton's review; the jury could reasonably conclude that as an attorney hired to represent the homeowner's interests in the transaction, Helton would have realized that the documents were not in order. And the government presented evidence that for certain deals, Helton was definitely made aware that

the loan applications were fishy. One EHNS investor testified that when, in Helton's presence, the investor noticed false information in his application and asked White about it, White told him the falsehood was "part of the real estate game" and "not to worry" about it. In addition, while present at the closings, Helton naturally would have observed that the investor did not provide the down payment checks. On some occasions, he would have observed that no down payment was made at all. Yet Helton said nothing, and he continued to represent EHNS clients in suspicious transaction after suspicious transaction. A jury could infer that he did so not out of ambivalence, but out of a desire to pocket more fees—fees paid out of the proceeds from the fraudulently obtained mortgage loans.

Indeed, the trial testimony showed that Helton was White's go-to guy for these transactions. Viewed in the light most favorable to the government, it was reasonable for the jury to conclude that White would not proactively arrange for an attorney to represent EHNS clients at the closings if the attorney was not also a knowing participant in the scheme. And in fact, the government presented testimony that Helton did more than just stand by—he affirmatively deceived clients by assuring hesitant parties that everything was in order. For instance, when one homeowner-client tried to read the papers herself, Helton told her that he was in a hurry, she did not need to read the documents, and that she should just sign.

Further, during his subsequent representation of EHNS clients in their Chapter 7 filings, Helton took steps to prevent the bankruptcy trustee and bankruptcy court from learning that the EHNS transactions ever took place. His instructions

to clients to lie about their recent real estate sales during creditor meetings, and his own lies and omissions in filings and court appearances, could certainly lead a jury to infer that he had a motive to cover up these transactions.

Helton also challenges his conviction on the count involving the Diamond Management deal. He argues that Diamond Management's bailout transactions were legitimate, and that he never intended to defraud mortgage lenders. However, the jury could conclude that the similarity between the EHNS and Diamond Management programs, and Helton's adoption of White's signature tactics—for instance, Helton's recruiting third-party investors, his providing the down payment check, and his use of Ford's services at Title Zone—were not coincidence. At the very least, the evidence showed that Helton deceived the lenders in that he concealed the fact that the buyer was a straw purchaser. In addition, the government presented evidence that Helton also represented Diamond Management clients in their bankruptcies, and similarly concealed the clients' recent real estate transfers from the authorities.

This was not a close call. Accordingly, we affirm the district court's finding of sufficient evidence to convict Helton on the wire fraud counts.

### 2. Bankruptcy fraud

For Helton to be convicted of bankruptcy fraud, the government had to prove that Helton engaged in a fraudulent scheme and that he filed a bankruptcy petition, or another document in a bankruptcy proceeding, in order to further the scheme. *See* 18 U.S.C. § 157(1)–(2); *United States v. Holstein*, 618 F.3d 610, 611–12 (7th Cir. 2010). The government

sought to prove that Helton carried out a scheme to defraud the EHNS clients' creditors by concealing the fact that the debtors had recently transferred a major asset.

Helton's primary argument about the insufficiency of the evidence is a red herring. He contends that he and his debtor clients did not withhold any necessary information from the bankruptcy court because the proceeds from the home sales were not part of the debtors' Chapter 7 estates. That being the case, he argues, no creditors were actually defrauded. Even if Helton were right that the debtors' recent transfers of property were of no consequence to their bankruptcy case (he's not),[5] the government need not prove that any creditors were actually defrauded in order to establish the elements of bankruptcy fraud. 18 U.S.C. § 157; *see also United States v. DeSantis*, 237 F.3d 607, 613 (6th Cir. 2001) (because the "[f]iling itself is the forbidden act" under § 157, "[s]uccess of the scheme is not an element of the crime").

The government did have to prove Helton's intent. It did so by offering evidence of the steps Helton took to prevent the bankruptcy authorities from discovering his clients' recent sales. Helton's defense at trial was that he did not know that the bankruptcy petitions contained material omissions (usually because the filings were prepared by his employees), or that he was not aware that the clients had recently transferred their property, or both. But the testimony of both Helton's employees and his clients contradicted his account. For instance, testimony revealed that Helton filed petitions

---

[5] Trustees testified that had they known about the real estate sales, they would have investigated the sales as fraudulent transfers.

that left out EHNS transactions at which Helton had been physically present—in some cases only weeks before. Helton's employees testified that when they did include information about the recent property sales, Helton removed the information before the document was filed. And the clients testified that Helton told them to lie during their creditor meetings and reprimanded the clients when they disobeyed him. As we do not reweigh the evidence or second-guess the jury's credibility determinations on appeal, *Holstein*, 618 F.3d at 612, we need not credit Helton's version of the story.

Thus, there was sufficient evidence to convict Helton of both crimes, and we affirm the district court's denial of his motion for acquittal.

## C. Joinder

We now proceed to the defendants' various arguments for why they should receive a new trial, beginning with joinder. White and Ford argue that their trial was misjoined with Helton's under Federal Rule of Criminal Procedure 8(b). In the alternative, all three defendants argue that Helton's trial should have been severed on grounds of prejudice pursuant to Federal Rule of Criminal Procedure 14.

Rule 8(b) provides that joinder is permissible when defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." We review a Rule 8 determination de novo. *United States v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007). We have interpreted "same series of acts or transactions" to mean "acts or transactions that are pursuant to a common plan or common scheme." *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985). In evaluating

whether a common scheme exists, the court looks solely to the allegations in the indictment. *Warner*, 498 F.3d at 699. The defendants need not be charged in every count, nor must they be charged with the same crimes. *Id*.

White and Ford protest that Helton's bankruptcy fraud "had nothing to do with the wire fraud." We disagree. The indictment alleges a single scheme to defraud homeowners and lenders through EHNS's mortgage bailout program; according to the indictment, the bankruptcy filings were part of the EHNS program, and also served as the scheme's cover-up. The indictment alleges that White and other EHNS employees referred clients to Helton so that they could "repair their credit." And the indictment alleges that during the bankruptcy proceedings, Helton took steps to conceal the existence of the EHNS transactions from the bankruptcy authorities. Thus, the fraudulent Chapter 7 filings furthered the overall scheme's success by preventing the trustees and the homeowners' creditors from recovering the proceeds of these sales—and of course, by shielding the defendants' illegal activities from official investigation. *Cf. Warner*, 498 F.3d at 699 (noting that "a conspiracy and its cover-up are parts of a common plan" (internal quotation marks omitted)). The fact that White and Ford were not involved in the bankruptcy filings does not matter if the filings were connected to the success of the overall scheme. Considering that we interpret Rule 8 "broadly" so as "to enhance judicial efficiency," *id.*, we find the joinder of Helton's bankruptcy fraud comfortably within the rule's scope.

There remains the question whether, notwithstanding proper joinder, the district court should have used its discretion to sever Helton's trial on grounds of undue prejudice

under Rule 14(a). Ford and White believe that their defense was prejudiced by the evidence of Helton's lies to the bankruptcy authorities. In turn, Helton believes he was prejudiced by the "inflammatory" and "sordid" evidence of White and Ford's deceptive tactics in carrying out the EHNS scheme. However, "it is not enough merely to show that separate trials might have provided the defendant a better shot at acquittal." *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013). Instead, the defendant bears the "heavy burden" of establishing that the joint trial "prevent[ed] the jury from arriving at a reliable judgment as to guilt or innocence." *Id.* We review the district court's decision for abuse of discretion only. *United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012). We find the district court acted within its discretion here.

First, Ford is conclusory in her description of how the evidence pertaining to the bankruptcies negatively influenced the jury in its evaluation of her and White's culpability. The gist of her argument on appeal is that the bankruptcy evidence was extensive, time-consuming, and did not directly relate to the wire fraud charges. This is not sufficient to establish that the bankruptcy evidence prevented the jury from coming to a reliable determination of White and Ford's guilt. Obviously, Ford and White were not charged with bankruptcy fraud. It should have been fairly easy for the jury to compartmentalize the evidence that applied only to Helton from the evidence pertaining to the other two defendants—and Ford has not persuaded us otherwise.

Nor are we persuaded by Helton's claim of a prejudicial spillover effect of the evidence pertaining to White and Ford. Much of the evidence about the EHNS scheme would have

been admissible against Helton regardless. *See United States v. Lanas*, 324 F.3d 894, 900 (7th Cir. 2003) (co-schemers' claims of prejudicial joinder are "undercut by the fact that much of the evidence admitted at their joint trial would have been admissible against them in separate trials as well"). Helton was charged with two counts of wire fraud arising out of EHNS transactions that he carried out with White and Ford, and multiple counts of bankruptcy fraud in connection with former EHNS clients. In addition to evidence pertaining to the transactions at which Helton was actually present, evidence about how the scheme worked generally would have been relevant even in a Helton-only trial. *See Warner*, 498 F.3d at 701 ("[E]vidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy case.").

Moreover, the district judge instructed the jury that it "must give each of [the defendants] separate consideration," "must analyze what the evidence shows about each defendant," and remember that "each defendant is entitled to have his or her case decided on the evidence and the law that applies to that defendant." The Supreme Court has held that limiting instructions "often will suffice to cure any risk of prejudice [caused by joinder]," *see Zafiro v. United States*, 506 U.S. 534, 539 (1993), and nothing leads us to believe that such instructions were ineffective here. Thus, there was no misjoinder, and the district court did not abuse its discretion in denying the defendants' severance motions.

## D.  Helton's *Brady* claim

Next, defendant Helton argues that the government suppressed exculpatory evidence contained in documents from

the bankruptcy case files that agents seized from his law office during the fraud's investigation. Helton says that this was a *Brady* violation. He acknowledges that he never raised this issue below, and as such, we can review only for plain error. Regardless, the claim is plainly without merit. To establish a *Brady* violation, Helton must show that the government suppressed material exculpatory evidence. The problem is that the government did not "suppress" the evidence Helton describes. The information he claims to have sought was in his own case files, which the government says were returned or otherwise made available to him well in advance of trial. Despite Helton's bare assertions to the contrary, we have no reason to doubt the government's credibility on this point.[6] And even if the files were not returned promptly, Helton himself knew of the bankruptcy case files' existence and whatever exculpatory potential they possessed. This is not a situation where the government knew something that he did not. *See United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) ("*Brady v. Maryland* deals with the concealment of exculpatory evidence unknown to the defendant." (internal citation omitted)). This claim also fails.

### E. Government Exhibit 20908 – the summary chart

We now move on to evidentiary matters. The defendants first object to the introduction of a government summary

---

[6] To support its claim that the government returned the case files or otherwise made their contents available before trial, the government points to three references to the confiscated case files—and their having been made available to the defendants—in its pretrial motions on unrelated matters.

chart ("Government Exhibit 20908"), which listed, in spread-sheet form, 236 property sale transactions closed by Title Zone, on behalf of EHNS, between March 2004 and September 2006. (This chart becomes important again later, so we will discuss its contents at some length.) The chart was based on Title Zone's files, which included documents like each sale's mortgage application and HUD-1 settlement statements. The chart was prepared as follows: the government had an accountant review all of the files—four bankers boxes' worth—for EHNS transactions during this time period (548 in total). The accountant first narrowed the pool down to transactions in which (1) there was an equity payment to EHNS of $15,000 or greater, and (2) the seller's mortgage payoff or payout was greater than $35,000. All 236 transactions that met these criteria were listed on the chart. From there, the chart indicated whether each transaction had certain objective characteristics. These included whether White or EHNS had provided the down payment check; whether the property's buyer had bought multiple properties within a short period of time; whether the loan officer was listed as Larry Collier, Raymond Lewis, Kevin Smith, or Eric Smith (which, as another witness testified, were White's common aliases); and whether the buyer listed one of White's companies as her employer on the loan application. The accountant determined whether the transaction contained these characteristics by reviewing the underlying files. In all, 225 transactions had one or more of these characteristics.

"Trial courts have broad discretion to admit or exclude evidence," and we review a claim that the court wrongly admitted evidence only for an abuse of this discretion. *United States v. Spiller*, 261 F.3d 683, 689 (7th Cir. 2001). To resolve this particular dispute, we find that we need to follow our

sister circuits in clarifying the distinctions between the two main ways that a party can summarize complex, voluminous documents at trial. *See, e.g.*, *United States v. Milkiewicz*, 470 F.3d 390, 395–98 (1st Cir. 2006); *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004). First, a party can introduce the information in a summary exhibit under Federal Rule of Evidence 1006, in order to "to prove the content of voluminous writings … that cannot be conveniently examined in court." If admitted this way, the summary itself is substantive evidence—in part because the party is not obligated to introduce the underlying documents themselves. *See Janati*, 374 F.3d at 273; Fed. R. Evid. 1006 (only requiring that the underlying evidence be "available for examination or copying, or both, by other parties at a reasonable time and place," or be subject to production in court upon order). Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves, however, the exhibit must accurately summarize those documents. It must not misrepresent their contents or make arguments about the inferences the jury should draw from them. *See Milkiewicz*, 470 F.3d at 396 ("The proponent must show that the voluminous source materials are what the proponent claims them to be and that the summary accurately summarizes the source materials.").

The other option is a pedagogical chart admitted pursuant to the court's "control over the mode … [of] presenting evidence" under Federal Rule of Evidence 611(a). Rule 611(a) pedagogical summaries are meant to facilitate the presentation of evidence already in the record. These summaries are not substantive evidence—instead, the summaries are meant to aid the jury in its understanding of evidence that has already been admitted. *Janati*, 374 F.3d at 273. For this reason, Rule 611(a) charts can be more one-sided in their

presentation of the relevant information. For instance, such exhibits may "include witnesses' conclusions or opinions," or "reveal inferences drawn in a way that would assist the jury." *Id.* Of course, admitting such pedagogical devices is within the district court's discretion. And when the district court does admit a summary on the basis, it should instruct the jury that such summaries are not evidence and are meant only to aid the jury in its evaluation of other evidence. *Id.*

We agree with the First Circuit that

> [t]he lines between these two types of summary documents are easily blurred. A summary that is admissible under Rule 1006 … could properly be offered under Rule 611(a) if the supporting material has been admitted into evidence. Likewise, a chart that originally was offered as a jury aid to assist with review of voluminous underlying documents already in evidence—and which accurately summarizes those documents—alternatively could be admitted under Rule 1006 if the court concluded that the supporting documents could not be examined conveniently in court.

*Milkiewicz*, 470 F.3d at 397. In this case, however, Government Exhibit 20908 was admitted as substantive evidence and allowed to go into the jury room—so it could not have been admitted as a Rule 611(a) pedagogical summary. *See Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 705 (7th Cir. 2013) ("The general rule is that materials not admitted into evidence simply should not be sent to the jury for use in its deliberations."). But no matter: we are satisfied that

the district court properly admitted the chart as a summary under Rule 1006.

The summary fulfilled every requirement of Rule 1006. The underlying Title Zone transaction documents were undoubtedly voluminous: the files filled four banker's boxes. Those boxes were made available to the defendants and the district court; in fact, the government introduced the documents themselves into evidence. And the chart itself was "representative": it simply catalogued instances of objective characteristics and added those instances together to create totals. True, the chart did not include every single transaction performed by EHNS during the relevant period. Accordingly, at the district court's instruction, the government indicated at the bottom of the spreadsheet that only 236 of the 548 EHNS transactions were listed. Moreover, in the course of three sidebar conferences dealing with the chart's admission, the district court took extensive steps to ensure that the document contained no argumentative labels or phrasing (for instance, the government could not refer to the selected transactions as "bailouts" or describe the characteristics as "suspect"), and the court forbade the government from using the chart's preparer to explain the significance of the characteristics on the spreadsheet or to explain to the jury what inferences it should draw from it. *See Milkiewicz*, 470 F.3d at 398 & n.16 (finding that the district court exercised its discretion with "meticulous care" when it took similar steps to excise prejudicial content prior to a Rule 1006 summary's admission). Finally, to the extent that the defendants argue that the chart did not contain other types of information that they wished it did have—for instance, the spreadsheet did not list the amount of the down payment that EHNS provided for each transaction—the defendants were free to cross-

examine the spreadsheet's creator to bring out that information. *See United States v. Swanquist*, 161 F.3d 1064, 1072–73 (7th Cir. 1998) (finding no abuse of discretion where the defendant "had ample opportunity during his cross-examination of [the document's preparer] to elicit any facts that might have suggested that the government's charts incorrectly captured the nature of [the underlying documents]").

After going through the effort to admit the summary chart under Rule 1006, the district court then instructed the jury that the summary chart was "not evidence" and that it was only admitted "to aid you in evaluating other evidence." This instruction, however, was appropriate for a Rule 611(a) summary, not a Rule 1006 summary—as discussed above, Rule 1006 charts are most certainly evidence. But in any event, the instruction inured to the defendants' benefit. It is not a basis for reversal.

As such, we find that the district court was within its discretion to admit Government Exhibit 20908.

## F.  Character evidence of Ford's law-abiding nature

Having found that the district court did not err in allowing certain evidence to come in, we now consider defendant Ford's claim that the court erred in keeping certain evidence out.

Ford took the stand at trial. On redirect, Ford sought to testify that she had cooperated in an FBI investigation of an identity-theft scheme during the relevant period. The FBI had reached out to Ford because the suspect had used Title Zone to close three loan transactions; when the suspect came back to Title Zone for another transaction, Ford stopped the

deal and contacted the FBI. At trial, Ford told the court that she wanted to use this episode to show that she did not ignore fraudulent activity when she learned of it. The court sustained the government's objection. It ruled that evidence of Ford's cooperation in the investigation of an entirely different fraud—a fraud in which she was not personally involved, and in which Title Zone was a victim—was unrelated and could confuse the jury.

On appeal, Ford argues that she should have been allowed to testify about her cooperation with the FBI as evidence of her law-abiding character under Rule 404(a)(2). Federal Rule of Evidence 404(a)(2) lists exceptions to the general prohibition against the use of character evidence: it provides, *inter alia*, that in a criminal case "a defendant may offer evidence of the defendant's pertinent trait." Fed. R. Evid. 404(a)(2)(A). Ford maintains that her character for law-abidingness is pertinent to the crime charged. Even assuming she is right, she overlooks the fact that Rule 405 limits the form such evidence can take. Under 405(a), admissible character evidence may be introduced in the form of opinion or reputation testimony. *Specific instances* of the defendant's character, on the other hand, may only be introduced if that character "is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). Ford's testimony about the time that she tipped off the FBI is evidence about a specific instance of her character. And Ford's law-abidingness, or lack thereof, is not an essential element of a wire fraud charge, nor a defense to it. We find no abuse of discretion in the district court's exclusion of this testimony.

### G. The multiple-schemes instruction

At trial, Ford and the government each proposed a jury instruction concerning the existence of multiple schemes to defraud. These instructions were aimed at the possibility of variance between the conduct charged in the indictment and the conduct proven by the government at trial; under some circumstances, such a variance can prejudice the defendant's right to a fair trial. *See United States v. Miller*, 471 U.S. 130, 134–36 (1985). Both Ford and the government's proposed instructions told the jury what to do if it found that the government had proven a scheme other than the large, overarching wire fraud scheme charged in the indictment. The district court found that Ford's proposed instruction incorrectly stated the law regarding multiple schemes; the court instead gave the government's as Jury Instruction No. 24. On appeal, Ford argues that the district court erred in refusing her instruction and in giving the government's.

When the defendant objects to the district court's refusal to give an instruction on her theory of defense, our review is de novo. *United States v. Vargas*, 689 F.3d 867, 877 (7th Cir. 2012). But Ford is only entitled to her instruction if it is a correct statement of the law. *Id.* We also review this question de novo. *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010).

Here, the district court was right to reject Ford's proposed instruction. We have rejected essentially the same instruction many times. *See, e.g., United States v. Campos*, 541 F.3d 735, 744–45 (7th Cir. 2008); *United States v. Wilson*, 134

F.3d 855, 864–65 (7th Cir. 1998) (listing cases).[7] We have stressed that instructions like Ford's are "always inappropri-

---

[7] Ford's proposed instruction:

Count One to Seven of the indictment charges that defendants knowingly and intentionally devised or participated in a scheme to defraud and in doing so defendants caused interstate wire communications to take place in the manner charged in the particular Count of the Indictment.

In order to sustain its burden of proof for this charge, the government must show that the single master scheme alleged in Count One to Count Seven of the indictment existed. Proof of separate or independent schemes is not sufficient.

In determining whether or not any single scheme has been shown by the evidence in the case you must decide whether common, master, or overall goals or objectives existed which served as the focal point for the efforts and actions of any members to the agreement. In arriving at this decision you may consider the length of time the alleged scheme existed, the mutual dependence or assistance between various persons alleged to have been its members, and the complexity of the goal(s) or objective(s) shown.

Even if the evidence in the case shows that Defendants was/were a member of some scheme, but that this scheme is not the single conspiracy charged in the indictment, you must acquit Defendants [of] this charge.

Unless the government proves the existence of the single master scheme described in the indictment beyond a reasonable doubt, you must acquit defendants of these charges.

ate as a matter of law," because they tell the jury that it *must* acquit if the government fails to prove the exact overarching scheme charged in the indictment. *Wilson*, 134 F.3d at 864–65. To the contrary, it is permissible for the government "to proceed *on a subset* of the allegations in the indictment, proving a conspiracy smaller than the one alleged, so long as that subset is also illegal." *Id.* at 865 (citation omitted) (emphasis added). Thus, Ford was asking for a patently erroneous instruction.

Further, the district court committed no error in giving Instruction No. 24 instead.[8] This multiple-schemes instruc-

---

[8] Jury Instruction No. 24:

> The indictment charges in Counts One through Eight that the defendants participated in a single scheme to defraud.

> Proof that there were multiple schemes to defraud is not necessarily proof of a single scheme to defraud, nor is it necessarily inconsistent with the existence of a single scheme to defraud.

> If you do not find beyond a reasonable doubt that a particular defendant devised or participated in a scheme to defraud, you should find that defendant not guilty of the respective counts.

> If you find beyond a reasonable doubt that there was one overall scheme to defraud as alleged in Counts One through Eight, then you should find that defendant of the respective count if each of the elements of the offense had been proved.

> If you find beyond a reasonable doubt that there were two or more schemes to defraud, you may find that defendant guilty of the respective count only if you

tion tells the jury that in the event that it finds that there were two or more schemes to defraud, it may convict only if the jurors "unanimously agree as to the particular scheme that the government has proven and further find beyond a reasonable doubt that the proven scheme to defraud was included within the scheme to defraud alleged in [the indictment]." The essence of this instruction has been approved in our decisions, *see United States v. Mansoori*, 304 F.3d 635, 656–57 (7th Cir. 2002); *Wilson*, 134 F.3d at 865, and the government appropriately modified it to require that the jury agree as to which scheme the government proved, *see United States v. Davis*, 471 F.3d 783, 791 (7th Cir. 2006). Ford complains that *Mansoori* and *Wilson* involved drug conspiracies, while the present case involves financial fraud. But she never explains why this is a distinction that makes a difference, and we do not see why it should. The underlying variance issue—that is, the requirement that the government charge in the indictment what it intends to prove at trial—is the same even if the nature of the crimes is different. Accordingly, we find no error in the district court's instructions.

---

unanimously agree as to the particular scheme that the government has proven and further find beyond a reasonable doubt that the proven scheme to defraud was included within the scheme to defraud alleged in Count One through Eight.

**H. White's sentencing**

Satisfied that all three defendants received a fair trial, we now proceed to defendant White's contentions about his sentence.

We review sentences for procedural error and substantive reasonableness. *United States v. Carter*, 538 F.3d 784, 789 (7th Cir. 2008). White challenges his sentence on both fronts. Procedurally, he argues that the district judge failed to respond meaningfully to his arguments about the loss amount enhancement, incorrectly calculated the loss amount under U.S.S.G. § 2B1.1(b)(1), and wrongly applied the vulnerable victim enhancement in U.S.S.G. § 3A1.1(b)(1). Substantively, White argues that his sentence was greater than necessary to provide specific deterrence and created unwarranted sentencing disparities between White and other fraud defendants. We review a district court's interpretation and application of the guidelines de novo and its findings of fact for clear error. *United States v. Natour*, 700 F.3d 962, 975 (7th Cir. 2012).

**1. The loss amount**

White's presentence report, in accordance with the government's calculation, recommended that White receive a twenty-level enhancement because EHNS's mortgage bailout scheme caused a loss greater than $7 million but less than $20 million. *See* U.S.S.G. § 2B1.1(b)(1)(K). (Actual loss, which is what the government proved here, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1, application note 3(A).) The government attributed about $9 million of loss to the mortgage lenders from the loans EHNS arranged between March

2004 and September 2006.[9] The government's addendum in-
cluded losses sustained by mortgage lenders with respect to
the 225 properties that had been identified in Government
Exhibit 20908 (the summary chart) as fraudulent mortgage
bailout transactions. As discussed above, these 225 transac-
tions were so identified because EHNS received at least
$15,000 from the sale, the prior mortgagee received a pay-
ment of at least $35,000, and the transaction itself had one or
more suspect characteristics (for example, the loan applica-
tion had been prepared by one of White's aliases). The gov-
ernment determined that lenders had recovered fully on 77
of these properties. 102 of these properties, however, had al-
ready gone through foreclosure; the government calculated
the loss as the balance of the unpaid principal at the time of
foreclosure, less the amount the lender recouped on resale.
For the 102 foreclosed properties, this figure totaled
$8,532,707. The government applied a 10% margin of error to
put the final estimate for the 102 foreclosed properties at
$7,679,436. There were 46 remaining properties without a
final disposition; for nine of them, the government deter-
mined that it had insufficient information to determine
whether the lender would incur a loss. For the other 37, the
government knew that the properties had entered foreclo-
sure proceedings; the government thus estimated these fu-
ture losses by multiplying the unpaid principal of all 37

---

[9] The indictment only charged the defendants with conduct between
August 2004 and September 2005; however, U.S.S.G. § 1B1.3(a)(2) allows
the court to include loss caused by conduct relevant to, but not specified
within, the counts of conviction. *United States v. Locke*, 643 F.3d 235, 243
(7th Cir. 2011).

loans by the rate of loss of the 102 foreclosed properties (51%). This figure came to another $3,014,583; the government applied a 50% margin of error to get a final estimate of $1,507,291 in future losses. In sum, then, the government calculated the loss amount as $9,186,727. Notably, the government did not include any losses to the EHNS clients—the $9 million figure was based solely on losses sustained by the mortgage lenders.

White raised several arguments contesting this calculation. For instance, he argued that 40 of the transactions listed in the chart did not appear to be bailout transactions, that most of the mortgages had gone on the secondary market and there was no way to tell whether the final noteholder had taken a loss, and that the figures from the foreclosure sales were unreliable. On appeal, White argues that the district court's responses to these arguments were so insufficient as to be procedurally unreasonable. *See Natour*, 700 F.3d at 974 (a district court can commit error by not adequately explaining its sentencing determinations). White complains that after the parties presented argument on the loss issue, the district court's analysis was nonresponsive and merely adopted the government's calculations "wholesale."

It is true that the district court did not go into great depth in addressing the merits of White's loss-calculation arguments. The following is the entirety of the court's own analysis of the loss issue:

> There has been an addendum filed by the government with the charts and government's calculations basically relate specifically to certain transactions and the Court agrees with the

government's calculations are, in fact, based on a conservative estimate of the loss amount. There is [no] exact formula as to the loss amount and the Court makes the calculations based on best estimates. And although the defendant continues to deny that the fraud was committed and continues to try and deflect the responsibility for losses, the government has pointed to reliable evidence that its loss amount calculation is correct. Thus, the 20-point enhancement for the loss amount calculated in the PSR is appropriate.

We recently reversed a district court's sentence on this basis in *United States v. Leiskunas*, 656 F.3d 732 (7th Cir. 2011). *Leiskunas* also concerned a defendant who committed mortgage fraud (albeit as a straw buyer), and the government had also alleged loss based on the difference between the loan amount and what the lender recouped in a foreclosure sale. *Id.* at 733–35. The defendant argued that this amount was not reasonably foreseeable to him because he did not know the property would go through foreclosure; the district court did not discuss this objection at all before adopting the PSR's calculation. *Id.* at 736, 738. "[B]ecause of the court's silence," we held, "we cannot be sure of the effect that Leiskunas's argument had, or could have had, on the court's sentencing decision." *Id.* at 738.

However, *Leiskunas* is distinguishable. In our case—when we evaluate the entirety of the sentencing transcript and review the district court's conclusions in context—the court made sufficient findings for us to meaningfully review its decision. *See Natour*, 700 F.3d at 977 (finding no error on this

basis when, "reading the sentencing procedure as a whole,"
we were satisfied that the district court adequately explained
its reasoning). First, the paragraph quoted above comprised
the entirety of the district court's own analysis of the loss,
but not the entirety of its discussion on the subject. Before
issuing its decision, the district court summarized each of
the defendant's specific loss-calculation arguments and the
government's response. In doing so, the court diligently—
and fairly—relayed the gist of each of White's contentions,
even if the court did not editorialize upon their merit. This
distinguishes our case from *Leiskunas*, where "the district
court provided no reasoning whatsoever for a loss amount."
*Id.* (also distinguishing the facts of *Leiskunas*). Unlike *Leisku-
nas*, we know from the record that the district court was
keenly aware of the defendant's arguments—and when the
district court adopted the government's calculation in the
face of such arguments, we can surmise what little persua-
sive effect they had.

White also argues that the district court failed to make an
explicit finding that the post-September 2005 transactions
(that is, the uncharged conduct) constituted relevant conduct
for the purposes of loss. We have said that the relevant-
conduct determination should be expressly stated by the dis-
trict court during the hearing. *See, e.g.*, *United States v. Ojo-
mo*, 332 F.3d 485, 489 (7th Cir. 2003). But we have also said
that we will not reverse a sentence on this basis "where it is
clear from the record that the district court considered and
adopted the facts recited in the presentence report, as well as
the government's reasoning concerning the significance of
those facts in establishing the defendant's responsibility for
uncharged conduct." *United States v. Acosta*, 85 F.3d 275, 280
(7th Cir. 1996) (affirming a sentence where the district

court's relevant conduct finding was "implicit"); *see also United States v. Locke*, 643 F.3d 235, 244–45 (7th Cir. 2011) (listing cases where we overlooked "a paucity of explicit findings by the sentencing judge" because there was "specific, objective evidence in the record" that such findings were warranted).

Here, the district court stated that "the PSR properly reflects a total offense level of 39," thereby adopting the PSR's findings. The court also stated that the government had put forth "reliable evidence to show by a preponderance of the evidence that its loss amount calculation was correct," and that the government had "related" its calculations to "certain transactions." More importantly, the court referred specifically to the government's summary chart. The court was very familiar with the contents of the chart due to the controversy about the summary's admission at trial; specifically, the court was familiar with the significance of the characteristics listed on the spreadsheet. Under these circumstances, we will not set aside the sentence because the court did not make the relevant conduct finding explicitly. *See Acosta*, 85 F.3d at 280; *United States v. Wilson*, 502 F.3d 718, 723 (7th Cir. 2007) ("That the court failed to invoke the specific phraseology of U.S.S.G. § 1B1.3(a)(2) does not mean it failed to make the necessary finding.").

White also takes issue with the loss calculation itself. He reiterates many of the arguments that he raised at sentencing—that the government included some transactions that he claims were not bailout transactions, that foreclosure data is inherently unreliable, and that the numbers do not show

the price that the secondary lenders paid for the mortgages.[10] But the district court need only make "a reasonable estimate of the loss" in applying the enhancement. U.S.S.G. § 2B1.1, application note 3(C). We review the district court's factual findings for clear error, reversing only when we are "left with the definite and firm conviction that a mistake has been made." *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010). Thus, on appeal, a defendant must "show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations." *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012) (citation and quotation marks omitted).

Given this standard, White's claim is unpersuasive. First, White provided no support for his assertion that forty of the transactions in the government's chart were not bailout transactions—he only gave the district court a list. He has not provided anything more compelling on appeal. Next, the government's definition of loss—the difference between the foreclosure price and the outstanding balance on the loan— is reasonable and indeed, frequently used in cases involving fraudulent mortgages. *See, e.g.*, *United States v. Smith*, 705 F.3d 1268, 1276 (10th Cir. 2013) (approving of such methodology "[a]s a general matter"). Further, the government's estimate of $9 million was likely conservative. The government

---

[10] White also insists that the government's loss figure did not take into account the mortgage payments that EHNS made on behalf of investors for the year-long period following the sale. But the government calculated loss based on the difference between the property's resale price and the loan's unpaid principal. That formula necessarily takes into account the amount of the loan that *was* paid, either by EHNS or others.

did not include properties for which it did not have suffi-cient data to conclude that the properties would be sold for a loss. The government also discounted both the total for the foreclosed properties and the soon-to-be-foreclosed proper-ties, the latter with a generous margin of error. Moreover, the total figure did not include losses to the deceived EHNS clients. The government only had to cross the $7 million threshold to establish the enhancement's applicability—the district court's calculation is not "outside the realm of per-missible computations."

### 2. The vulnerable victim enhancement

White also challenges the district court's application of the vulnerable victim enhancement. U.S.S.G. § 3A1.1(b)(1) instructs the sentencing judge to increase the offense level "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." The application notes define "vulnerable victim" as a person "who is a victim of the offense of conviction and any conduct for which the de-fendant is accountable," and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Only one victim of the scheme need qualify for the enhancement to apply. *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003).

Our court recently addressed who counts as a vulnerable victim in the context of a mortgage bailout scheme in *United States v. Johns*, 686 F.3d 438, 457–60 (7th Cir. 2012). As *Johns* controls White's challenge, an extended summary is helpful. In *Johns*, the defendant participated in a "rinsed equity" scheme: Johns and his partner, Banks, would purchase homes from their owners at highly inflated prices. As a con-dition of the sale, the homeowners had to promise to return

to Johns and Banks any proceeds in excess of what the homeowner owed to their original mortgage lender. "In essence, Johns and Banks were manufacturing equity, then demanding it back from the homeowners." *Id.* at 441. In the transaction that led to Johns' indictment, the homeowners, the Ten Hoves, were already in Chapter 13 proceedings and were facing a sheriff's sale of their home. The Ten Hoves sold their home to Banks, and Johns used some of the rinsed equity to pay off the Ten Hoves' other creditors in full. In the end, the Ten Hoves were able to avoid foreclosure and walk away from the sale without any outstanding debt, even though they retained none of the home's equity. *Id.* at 443–44. The district judge also considered two of Johns' other rinsed-equity transactions as relevant conduct. One transaction, involving a homeowner named Coleman, was very similar in circumstances to the Ten Hoves, including the fact that Coleman's "only other option" was foreclosure. *Id.* at 445. The third sale involved the Spellers, who were also facing foreclosure. *Id.* at 445. But unlike the Ten Hoves and Coleman, the Spellers had not been under the impression that they were selling their home outright. The record indicated that the Spellers thought that the equity created by the sale would be used only to pay their mortgage and taxes for some period of time, and then they would reacquire the property. *Id.* at 457.

In *Johns*, we broke the § 3A1.1(b)(1) analysis into two separate questions: one, were these homeowners *vulnerable*, and two, were they actually *victims* of the defendant's offense or other relevant conduct? *Id.* at 458. With regard to the second question, we held that individuals can be victims only if they "experienced some actual or intended harm." *Id.* at 460. The government argued that all of the homeowners

were harmed because the rinsed-equity transactions stripped their homes of potential equity and transferred it wrongfully to Johns and Banks. We disagreed. Noting that the district court had found that the Ten Hoves and Coleman were already facing foreclosure at the time of the transactions, we reasoned that if they had instead gone through with the forced sales, there would have been no equity for them to lose. *Id.* at 455–56. In addition, we found that the rinsed-equity transactions actually made the Ten Hoves and Coleman better off in that they avoided foreclosure, were guaranteed to receive enough cash to pay off their lenders, and—in the case of the Ten Hoves—were able to exit bankruptcy quickly. *Id.* at 456. By contrast, we could not conclude from the district court's findings whether the Spellers were similarly made better off. *Id.* at 457. Although the Spellers were also in foreclosure, the district court nonetheless stated that the Spellers may have had some equity in their home. *Id*. We speculated that "the district court may [have believed] that the Spellers were duped into giving up the equity they had in their house (which could have been accessed through a forced sale) in order to gain the advantages proposed by Johns and Banks—an option to repurchase and equity used for their benefit." *Id.* Thus, unable to conclude whether the Spellers suffered financial loss, we remanded the issue. *Id.*

The district court sentenced White without the benefit of *Johns*, which was decided the following year. As a result, the court's factual findings on the matter—and the government's proof—were not as explicit as we might prefer going forward. Nonetheless, we find no error in the district court's identifying the EHNS homeowners as vulnerable victims.

First, the EHNS clients were "vulnerable" under the standard set out in *Johns*. There, we squarely held that "financial desperation is enough to make one vulnerable to financial crimes," and noted that the fact that the homeowners "were in a position to lose their home at the time of their transaction" sufficed to find them financially desperate. *Id*. at 460. Here, the district court found that multiple homeowners were facing foreclosure at the time they entered into EHNS's program. And the court noted that "victim after victim took the stand and testified relating to how desperate they were and how the defendant … took advantage of these individuals with the false promise of saving their houses when he, in fact, knew that at the end their houses will not be salvaged." There is plenty of witness testimony in the record to support the court's characterization.[11]

The second question is whether the homeowners "would have been in a better financial position but for" EHNS. *Johns*, 686 F.3d at 456. As discussed above, the district court needed to find that at least one homeowner suffered actual financial harm as a result of her participation in the bailout program. The court did so find: it concluded that White "took advantage of [the homeowners'] vulnerability and *put them more in the hole than they would have been* had he not taken ad-

---

[11] The district court also found that some homeowners could be considered vulnerable on account of their being churchgoers that White targeted by appealing to their religion. As mentioned above, "Eyes Have Not Seen" is a reference to a biblical verse, and EHNS advertised on gospel radio stations. Given that these homeowners could be found vulnerable on the basis of their financial desperation alone, however, we express no opinion on the court's finding vulnerability on the basis of their religion.

vantage of them." (emphasis added). The trial record supports this finding. For one, although White (like the defendant in *Johns*) often manufactured the equity that EHNS drew out of these properties, there was evidence that in some instances, the program stripped homeowners of equity that would have been rightly theirs. Some EHNS properties were appraised at amounts yielding equity in excess of $60,000—given that White usually pressured appraisers to inflate their equity estimate only to $30,000 or so, it stands to reason that those $60,000+ properties actually had some value to lose. Indeed, some of the straw purchasers were later able to sell their properties at a profit. Further, there was evidence that the EHNS program damaged clients' financial health. For instance, one client testified that she ended up owing more in rent payments to her home's purchaser than she had originally been paying in monthly mortgage payments. And of course, at EHNS's urging, many homeowners filed for bankruptcy—thereby further damaging their credit.

White insists that, like the Ten Hoves and Coleman in *Johns*, all of the EHNS clients would have ended up losing their homes anyway. But the EHNS homeowners were more akin to the Spellers than to the Ten Hoves and Coleman. Like the Spellers, many of the EHNS clients were "duped" into giving up their homes—they did not make an informed choice to sell. Even if the homeowners might have ended up in foreclosure absent the EHNS sale, White and his co-defendants deprived them of the opportunity to recover equity or explore other options that might have saved their home.

For these reasons, we find no error in the district court's applying the vulnerable victim enhancement.

### 3. The substantive reasonableness of the sentence

Finally, White challenges his sentence's reasonableness. After applying the enhancements discussed above and others, the court calculated a total offense level of 39 and a criminal history category of I. The resulting advisory guidelines range was 262 to 327 months imprisonment; the court sentenced White to 266 months. We apply a presumption of reasonableness to all within-guidelines sentences. *See Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008).

White cannot overcome this presumption. He first contends that courts routinely depart downward from the guidelines when it comes to fraud sentences, and therefore the district court created an unwarranted sentencing disparity when it issued a sentence within the guidelines range. *See* 18 U.S.C. § 3553(a)(6). But even if White were right about there being "near unanimity" that the guideline ranges for fraud offenses are too high—a premise that we question—we have repeatedly held that a within-guidelines sentence necessarily takes into account unwarranted disparities. *See, e.g., United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012). This is because "the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Indeed, we have noted that imposing a within-guidelines sentence is the surest way to *avoid* unwarranted disparities. *United States v. Babul*, 476 F.3d 498, 501–02 (7th Cir. 2007).

White also argues that his sentence is greater than necessary to achieve specific deterrence. *See* 18 U.S.C. § 3553(a)(2)(C). But the district court found that although this was White's first serious conviction, White had previ-

ously committed several crimes, including theft and making false statements on a credit card application. The court also highlighted White's failure to acknowledge his wrongdoing and reasoned that a significant sentence was necessary to promote White's respect for the law. *See id.* § 3553(a)(2)(A). Further, the court emphasized the seriousness of mortgage fraud offenses in undermining the integrity of financial institutions. *See id.*

Overall, the district court gave meaningful consideration to the § 3553(a) factors and thoroughly explained its reasons for rejecting White's mitigating arguments. White has not rebutted the presumption that his within-guidelines sentence is reasonable.

### III. Conclusion

We AFFIRM the convictions and sentences of the three defendants.